IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

STATE OF HAWAII, DEPARTMENT ) CIVIL 18-00128 LEK-KJM
OF HUMAN SERVICES, DIVISION )
OF VOCATIONAL REHABILITATION, )
HOOPONO-SERVICES FOR THE )
BLIND, )
)
          Plaintiff, )
)
     vs. )
)
UNITED STATES MARINE CORPS, )
by and through )
GENERAL ROBERT B. NELLER, )
Incumbent Commandant of the )
Marine Corps, in his official )
capacity, )
)
          Defendant. )
_____ )

**ORDER GRANTING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**

On April 17, 2018, Plaintiff State of Hawai`i,

Department of Human Services, Division of Vocational

Rehabilitation, Ho`opono - Services for the Blind ("Ho`opono")

filed its Motion for Temporary Restraining Order ("TRO Motion").

[Dkt. nos. 12 (Motion) & 13 (Mem. Supp. of Motion).[1]] Defendant

United States Marine Corps, by and through General

Robert B. Neller, Incumbent Commandant of the Marine Corps, in

his official capacity ("Marine Corps" or "Defendant"), filed its

memorandum in opposition on April 26, 2018, and Ho`opono filed

---

[1] On April 29, 2018, Ho`opono filed an addendum containing
the Table of Contents and the Table of Authorities for the
memorandum in support of the TRO Motion. [Dkt. no. 20.]

its reply on May 1, 2018.  [Dkt. nos. 19, 27.]  This matter came on for an evidentiary hearing on May 9, 2018.  Hoopono's Motion is hereby granted for the reasons set forth below.

## BACKGROUND

On April 3, 2018, Ho`opono filed its: Complaint for Motion for Declaratory and Injunctive Relief ("Complaint"), pursuant to pursuant to the Randolph-Sheppard Vending Stand Act, 20 U.S.C. § 107, *et seq.* ("the RSA");[2] and Motion for Declaratory and Injunctive Relief ("Injunction Motion").  [Dkt. nos. 1 (Complaint), 2 (Injunction Motion) & 3 (Mem. Supp. of Injunction Motion).]  Ho`opono is the RSA SLA in Hawai`i.  General Neller is the highest ranking officer in the Marine Corps, and he is

---

[2] The Ninth Circuit has stated:

> The Randolph-Sheppard Act establishes a cooperative program between the federal government and the states to assist blind persons who wish to operate vending facilities on federal property. See 20 U.S.C. § 107. . . .  The Rehabilitation Services Administration within the Department of Education administers the Act with the help of state agencies designated by the Secretary of Education.  §§ 107(b), 107a(a), 107b.  In participating states, these state agencies (referred to as "state licensing agencies" [or "SLAs"]) issue licenses to blind persons that make them eligible to operate vending facilities on federal properties within that state. § 107a(b). . . .

Sauer v. U.S. Dep't of Educ., 668 F.3d 644, 645-46 (9th Cir. 2012).

responsible for all Marine Corps bases, including Marine Corps

Base Hawai`i ("MCBH"). [Complaint at ¶¶ 30-31.]

The facts of this case are largely undisputed and are

established by the parties' exhibits[3] and the live testimony at

the evidentiary hearing. For approximately five years, Hoopono's

licensed blind vendor – Stanley Young, with teaming partner

Blackstone Consulting, Inc. ("BCI") – has successfully operated

the MCBH food service facilities. Their services have

consistently received satisfactory ratings, with one excellent

rating. [Mem. in Supp. of Injunction Motion, Exh. 2 (Decl. of

Lea Dias ("Dias Decl.")) at ¶ 18;[4] Errata, filed 4/13/18 (dkt.

no. 11), Exh. 3a (Decl. of Joseph Blackstone ("Blackstone

Decl.")) at ¶ 24, Exh. A (MCBH Contractor Performance Assessment

Reporting System printout).[5]] The Marine Corps states the

_____

[3] At the evidentiary hearing, by stipulation, the Court
received in evidence Hoopono's Exhibits 1 to 21 and the Marine
Corps' Exhibits A to O.

[4] Lea Dias is Hoopono's Branch Administrator, and has been
in that position since 2009. [Dias Decl. at ¶¶ 2, 6.] Ms. Dias
is also "the immediate Past President of the National Council of
State Agencies for the Blind and currently serve[s] on its
Executive Committee." [Id. at ¶ 7.] Ms. Dias is Hoopono's
contact person for Hoopono's current MCBH contract. [Id. at
¶ 27.]

[5] Ho`opono originally filed Mr. Blackstone's declaration
with the memorandum in support of the Injunction Motion, but it
inadvertently filed an unsigned version of the declaration.
[Dkt. no. 3-6.] Exhibit 3a is signed version. Joseph Blackstone
is BCI's president. [Blackstone Decl. at ¶ 2.] BCI is a
corporation that "assist[s] licensed blind vendors as a teaming
(continued...)

current contract – which was designated "a competitive

Section 8(a) set-aside[6] subject to a SLA having priority for

award under the RSA" – was solicited in 2010, but the contract

period did not start until March 1, 2013 because of multiple bid

protests by the incumbent vendor. [Def.'s Exhibit List, filed

4/25/18 (dkt. no. 17), Exh. O (Decl. of Eileen Keating Carnaggio

("Carnaggio Decl.")) at ¶ 5.[7]]

      After Ho`opono bid on the contract, the Marine Corps

engaged in extensive negotiations with Ho`opono and BCI about

staffing concerns.[8] The Marine Corps' concerns were ultimately

---

    [5] (...continued)
partner to operate military troop dining facilities in cafeterias
and other mess halls across the nation." [Id. at ¶ 4.]

    [6] "Pursuant to [Small Business Administration ("SBA")]
regulations . . . , implemented under 15 U.S.C. §§ 634, 644,
Government procurement contracts, upon agreement between SBA and
the procuring Government agency, can be 'set-aside' for bidding
by small business concerns exclusively." Massey Servs., Inc. v.
Fletcher, 348 F. Supp. 171, 173 n.2 (N.D. Cal. 1972). The
regulations governing the Section 8(a) Business Development
("BD") Program are 13 C.F.R. §§ 124.1 to 124.704. "The purpose
of the 8(a) BD program is to assist eligible small disadvantaged
business concerns compete in the American economy through
business development." 13 C.F.R. § 124.1.

    [7] Ms. Carnaggio is a civilian employee of the Marine Corps,
who is currently assigned to the Regional Contracting Office
Hawai`i ("RCO-HI"). [Carnaggio Decl. at ¶ 1.] She is the
contracting officer who handled the Solicitation and the
evaluation and award of the contract referenced therein. [Id. at
¶ 3.] She testified she was not the contracting officer who
handled the solicitation and award process for Hoopono's current
contract.

    [8] According to the Complaint, the negotiations occurred
                                          (continued...)

satisfied, and it deemed Hoopono's proposed staffing to be fair
and reasonable.  The contract was worth approximately
$14 million.  [Dias Decl. at ¶ 23.]

The contract ran through the end of February 2018, but
the Marine Corps invoked the extension clause of the contract.
The Marine Corps exercised its extension options through May 15,
2018, but has declined to exercise the remaining options, which
would have run through the end of September, *i.e.*, 180 days after
the expiration of the contract's original term.  [Id. at ¶¶ 46-
47, 49.]  The extension options were exercised based on findings
that Hoopono's staffing, pricing, and past performance were fair
and reasonable.  [Id. at ¶ 46.]

During the first four years of the contract, the Marine
Corps did not express staffing concerns, but in the last year, it
expressed that only United States citizens should be on staff.
Ho`opono and BCI argued this discriminated against current
employees who held Green Cards and previously received clearance
to work on MCBH.  After negotiations and modifications, such
employees were allowed to remain on staff.  However, the dispute
raised deportation fears among some of the staff, and a few

---

[8] (...continued)
after the Marine Corps found Hoopono's proposal to be in the
competitive range.  The negotiations involved staffing and cost
requirements, and several adjustments were made before the Marine
Corps found that Hoopono's staffing and prices were fair and
reasonable.  [Complaint at ¶¶ 42-43.]

resigned before the modifications were finalized. [Blackstone
Decl. at ¶¶ 25-26.] During the negotiations for the extension
options, the Marine Corps initially only wanted Ho`opono to
employ United States citizens, but it eventually agreed to allow
the employment of persons who held Green Cards. All terms of the
current contract govern the extension option period. Ho`opono
and BCI therefore believed the Marine Corps did not have any
concerns about the other terms. [Id. at ¶¶ 28-29.] As recently
as September 2017, the Marine Corps deemed Hoopono's staffing –
including number and job descriptions – to be fair, reasonable,
and acceptable. [Id. at ¶ 33.]

On September 11, 2017, RCO-HI posted a pre-solicitation
notice ("Pre-Solicitation"), which noted the required services
would be subject to the RSA. Ms. Carnaggio informed Ms. Dias
about the Pre-Solicitation and provided her with milestone dates
in a September 21, 2017 email. [Carnaggio Decl. at ¶ 8
(discussing Exhs. D (email chain between Ms. Carnaggio and
Ms. Dias dated from 5/5/17 to 9/25/17) & E (Pre-Solicitation)).]

On September 25, 2017, the Marine Corps issued
Solicitation number M003-18-17-R-0003 for a new MCBH food
services contract with a base term of one year, with four option
years ("Solicitation"). [Dias Decl. at ¶ 31; Mem. in Supp. of
Injunction Motion, Exh. 9 (Solicitation).] On October 24, 2017,
the Marine Corps amended the Solicitation to add the requirement

that the contractor staff the food service facilities with a minimum number of employees who fell within certain job descriptions ("Amendment 1"). [Dias Decl. at ¶ 33; Mem. in Supp. of Injunction Motion, Exh. 9a (Amendment 1).] Amendment 1 altered several portions of the Solicitation's Performance Work Statement ("PWS") §§ 2.6 and 2.6.1, setting forth new minimum staffing requirements in multiple labor categories. [Carnaggio Decl. at ¶ 11.] Ho`opono and other vendors were informed of Amendment 1, and Ms. Dias signed an acknowledgment of receipt. [Id. at ¶ 12, Exh. H.] Ms. Carnaggio emphasizes that Ho`opono did not challenge the terms of the Solicitation, as amended, by submitting either an agency bid protest to the Marine Corps or a bid protest to the United States Governmental Accountability Office ("GAO"). Further, Ho`opono represented that its Proposal did not identify any exception to the Solicitation's terms. [Id. at ¶ 14, Exh. I (letter dated 11/6/17 to Ms. Carnaggio from Ms. Dias, with Exceptions/Assumptions page).]

On November 8, 2017, the Marine Corps amended the Solicitation to: require that the contractor only employ United States citizens; make grammatical changes; and extend the due date for proposals to November 20, 2017 ("Amendment 2"). [Dias Decl. at ¶ 33; Complaint at ¶¶ 19-20.] Ho`opono asserts Amendment 2 is not relevant to the issues presented in this case. [Mem. in Supp. of TRO Motion at 12.] There was also a third

amendment ("Amendment 3"), but Ho`opono asserts it is not relevant because it was only offered to bidders that were deemed to be in the competitive range, *i.e.*, it was not offered to Ho`opono. [Complaint at ¶ 49.] The Marine Corps apparently agrees Amendment 2 and Amendment 3 are not relevant to the TRO Motion. <u>See</u> Carnaggio Decl. at ¶ 13 (noting the issuance of Amendments 2 and 3 but not discussing them).

Ho`opono timely submitted its response to the Solicitation ("Proposal") on November 17, 2017. [Dias Decl. at ¶ 34.] The Proposal "includes a list of employees and staff whose numbers exceed that of employees and staff in the current contract extension, and reflects the staffing requested by Defendant in past and current contracts." [Blackstone Decl. at ¶ 34.] Ho`opono requested that, if the Marine Corps desired modifications to the staffing levels in the Proposal, it discuss them with Ho`opono in direct negotiations, but the Marine Corps has refused. [<u>Id.</u>] According to Ho`opono, the Proposal included the same staffing levels in its current contract and the extension option periods, with the minimum increase required by Amendment 1. Ho`opono argues its Proposal should have been deemed to be in the competitive range based on Hoopono's "technical capability, past performance and price," and it should have been afforded priority under the RSA. [Complaint at ¶ 54.]

A Technical Evaluation Team ("TET") reviewed all proposals submitted in response to the Solicitation and ranked them against the technical evaluation criteria from the Addendum to Federal Acquisition Regulation ("FAR") 52.212-2 EVALUATION – Commercial Items (October 2014), which is included in the Solicitation. The TET members reviewed each of the proposals individually, without comparing it to the others. Each TET member documented each proposal's strengths, weaknesses, deficiencies, risks, and any items for future discussion. The TET leader and the TET evaluator reviewed the TET members' evaluations to determine a consensus rating for the technical factors.[9] The TET leader prepared a report setting forth the TET's collective opinion. [Carnaggio Decl. at ¶ 15.] The TET's consensus ratings for Hoopono's Proposal were: corporate experience – outstanding; management plan – acceptable; quality

_____

[9] The technical factors of a proposal include "Corporate Experience, Management Plan, Quality Control Plan, Food Service Operations Plan, Staffing and Transition Plan." [Dias Decl. at ¶ 36.] According to Ho`opono:

> The technical portion of the bid pertains to staffing, qualifications and training of the staff and employees and how it relates to determining the price of the contract. The staff and employees are the majority of the price of the bid as these employees are also covered by collective bargaining rules that need to be complied with in determining the number of staff and employees to service the contract.

[Complaint at ¶ 56.]

control plan – acceptable; food services operations plan – unacceptable; and staffing and transition plan – unacceptable. Because of the unacceptable ratings for food services operations and staffing/transition, Hoopono's overall technical rating was unacceptable, and its Proposal not "eligible for further evaluation or potential award."  [Id. at ¶ 16.]  In other words, Hoopono's past performance and price were not considered.

Once the RCO-HI completed its evaluation of all proposals, it prepared a Pre-Business Clearance Memorandum ("Clearance Memo") which: summarized the evaluation of all proposals; recommended which proposals were to be placed in the competitive range;[10] identified questions to discuss with vendors in the competitive range; and sought authorization to begin those discussions.  The Marine Corps' Marine Corps Acquisition Policy and Procedures ("MAPP") required RCO-HI to obtain: approval of the Clearance Memo from the Marine Corps Installations Command Pacific regional contracting office in Japan; approval from the Marine Corps Installation Command contracting office in Washington D.C.; and legal clearance of the Clearance Memo.  All required approvals and clearances were obtained, and Ms. Carnaggio then established the competitive range of vendors that her office would engage in discussions with under

_____

[10] At the evidentiary hearing, Ms. Carnaggio testified there was only one proposal that was included in the competitive range.

FAR 15.306. Hoopono's Proposal was not included in the competitive range because of its unacceptable overall rating for its technical elements. [Id. at ¶ 17.]

In a letter dated February 13, 2018, sent to Ms. Dias by email, Ms. Carnaggio informed Ho`opono she deemed Hoopono's bid technically unacceptable ("2/13/18 Rejection Letter"). [Dias Decl. at ¶ 35, Exh. A (2/13/18 Rejection Letter).] On February 14, 2018, Ms. Dias requested a debriefing from Ms. Carnaggio, who sent a Pre-Award Debriefing report on February 15, 2018 ("2/15/18 Debriefing"). [Id. at ¶¶ 37-38, Exh. B (2/15/18 Debriefing).] On February 16, 2018, Ms. Dias sent Ms. Carnaggio an email response to the 2/15/18 Debriefing, and Ms. Carnaggio sent a response on February 21, 2018 ("2/21/18 Debriefing"). [Id. at ¶¶ 39, 41, Exh. C (2/21/18 Debriefing).]

In the Debriefings, Ms. Carnaggio stated she was unwilling to engage in direct negotiations about the staffing issue and would not allow Ho`opono to submit clarification. She therefore removed Hoopono's Proposal from the competitive range without evaluating the entire Proposal. She did not apply the RSA's priority in rejecting the Proposal. [Id. at ¶ 42.]

On April 10, 2018, a private vendor – The Severson Group, LLC ("Severson") – was awarded the contract described in the Solicitation. The amount of the contract is

$18,419,014.74.[11] [Mem. in Supp. of TRO Motion, Exh. 17

(printout from the Federal Business Opportunities website for

Management and Mess (M&MA) Services award information for the

Solicitation).] Severson is a SBA-certified "Section 8(a)

Business, Small Disadvantaged Business, and Veterans

Administration Certified Service-Disabled Veteran-Owned Small

Business." [Carnaggio Decl. at ¶ 18 & Exh. N (letter dated

4/6/18 to Ms. Carnaggio from Carlos Liu of the SBA, confirming

Severson's eligibility for the 8(a) Program).] At the

evidentiary hearing, Ms. Carnaggio testified the Marine Corps

engaged in negotiations with Severson after Severson's proposal

was determined to be in the competitive range, and Severson was

allowed to submit a final proposal revision. Ms. Carnaggio

interpreted the FARs as only allowing for negotiations with, and

proposal revisions by, an offeror whose proposal is in the

competitive range. However, she also acknowledged that, under

FAR § 15.303, she had the discretion to elevate an unacceptable

proposal into the competitive range, but she determined there was

no compelling reason to do so with Hoopono's Proposal.

Severson's contract was scheduled to begin April 15,

2018, with a thirty-day overlap of service for the transition

---

[11] At the evidentiary hearing, Ms. Carnaggio acknowledged
the amount of Hoopono's Proposal was approximately $2 million
less, but she stated the two prices could not be compared because
Hoopono's Proposal was technically deficient.

from Hoopono's services to Severson's.[12] [Mem. in Supp. of Injunction Motion, Exh. 7 (email string between Steve Forjohn, Marine Corps' counsel, and Lori Wada, Esq., Hoopono's counsel, from 3/14/18 to 3/16/18).] Ms. Carnaggio testified Severson is scheduled to assume full services at MCBH on May 16, 2018.

On March 22, 2018, Ho`opono requested arbitration pursuant to the RSA, 20 U.S.C. § 107d-1(b). [Complaint at ¶ 26 (citing Complaint, Exh. 6).] Ho`opono filed this action to obtain a court order requiring MCBH to maintain the status quo until there is a decision in the pending arbitration. [Id. at ¶¶ 27, 68.] Ho`opono filed the TRO Motion to preserve the status quo until this Court rules on the Injunction Motion, which seeks to preserve the status quo until the arbitration panel renders its decision.

**STANDARD**

This Court has described the applicable standards as follows:

> In general, the standard for a temporary restraining order or a preliminary injunction is as follows:

---

[12] Severson's president has informed Ms. Carnaggio that Severson "has begun transition and staffing work necessary to ensure it can institute full performance" on the contract's official start date of May 16, 2018. [Carnaggio Decl. at ¶ 19.] Ms. Carnaggio testified Severson has been interviewing personnel currently working at the MCBH dining facilities under Hoopono's contract, as well as recruiting corporate staff, which has involved applicants flying to Hawai`i for interviews.

13

> "[I]njunctive relief is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." <u>Winter v. Natural Res. Def. Council, Inc.</u>, 555 U.S. 7, 129 S. Ct. 365, 376, 172 L. Ed. 2d 249 (2008). The standard for granting a preliminary injunction and the standard for granting a temporary restraining order are identical. <u>See</u> <u>Haw. Cnty. Green Party v. Clinton</u>, 980 F. Supp. 1160, 1164 (D. Haw. 1997); Fed. R. Civ. P. 65.

<u>Sakala v. BAC Home Loans Servicing, LP</u>, CV. No. 10-00578 DAE-LEK, 2011 WL 719482, at *4 (D. Hawai`i Feb. 22, 2011) (alteration in original).

> A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest. <u>Am. Trucking Ass'ns v. City of Los Angeles</u>, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting <u>Winter v. Natural Res. Def. Council, Inc.</u>, 555 U.S. 7, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008)) (explaining that, "[t]o the extent that [the Ninth Circuit's] cases have suggested a lesser standard, they are no longer controlling, or even viable" (footnote omitted)); <u>see also</u> <u>Winter</u>, 129 S. Ct. at 374-76 (holding that, even where a likelihood of success on the merits is established, a mere "possibility" of irreparable injury is insufficient to warrant preliminary injunctive relief, because "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief").

<u>Painsolvers, Inc. v. State Farm Mut. Auto. Ins. Co</u>., 685 F. Supp. 2d 1123, 1128-29 (D. Hawai`i

2010) (footnote and some citations omitted)
(alterations in original). . . .

Pac. Radiation Oncology, LLC v. Queen's Med. Ctr., 47 F. Supp. 3d
1069, 1075 (D. Hawai`i 2014) (alterations in Pac. Radiation)
(some citations omitted).

**DISCUSSION**

At the outset, this Court notes it does not have to
decide the ultimate issue of whether the Marine Corps violated
the RSA in awarding the MCBH contract to Severson.  That issue is
for the arbitration panel to decide.  The instant case is limited
to the determination of who will operate the MCBH food services
facilities while the arbitration is pending.

**I.    Likelihood of Success**

Disputes between a SLA and a federal agency controlling
a property with a vending facility are governed by 20 U.S.C.
§§ 107d-1(b), 107d-2(a), and 107d-2(b)(2).  Sauer, 668 F.3d at
646.

> If a state licensing agency determines that the
> federal entity in control of the property on which
> a vending site is located is failing to comply
> with the Act, the state agency "may file a
> complaint with the Secretary who shall convene a
> panel to arbitrate the dispute."  § 107d-1(b).
>
> If a blind licensee triggers an arbitration
> proceeding, it is governed by § 107d-2(b)(1) of
> the Act. . . .

Id. at 646-47 (footnotes omitted).  Ho`opono has submitted a
complaint to the Secretary of Education and the Acting

Commissioner of the Rehabilitation Services Administration, pursuant to § 107d-1(b) ("Arbitration Request"). [Mem. in Supp. of Injunction Motion, Exh. 6.] Neither the RSA nor its implementing regulations set forth a specific deadline for the submission of a § 107d-1(b) arbitration request. Ho`opono submitted the Arbitration Request less than forty days after the 2/13/18 Rejection Letter, and the Marine Corps has not argued the Arbitration Request was untimely. This Court therefore assumes, for purposes of the TRO Motion, that the Arbitration Request was timely.

The issues raised in the Arbitration Request include:

1) whether the Marine Corps violated the RSA and its implementing regulations in the Solicitation process by failing to apply the RSA priority to the Solicitation, including by failing to seek a determination from the Secretary of Education as to whether Ho`opono could provide the dining services "at a reasonable cost, with food of a high quality comparable to that currently provided";

2) whether the Marine Corps violated the RSA and its implementing regulations in the manner in which it evaluated Hoopono's Proposal; and

3) whether the Marine Corps violated the RSA and its implementing regulations by imposing limitations in the Solicitation without obtaining a determination from the Secretary of Education that the limitations were justified.[13]

---

[13] At the evidentiary hearing, Ms. Carnaggio asserted the PWS in the Solicitation, as amended, only contained the terms that are necessary to achieve the desired quality of dining services at MCBH. She asserted these terms were not limitations, and therefore the Marine Corps was not required to consult the Secretary of Education to determine whether a limitation was

(continued...)

[<u>Id.</u> at 3.] Based on the RSA, its implementing regulations, and the examples of RSA arbitration decisions Ho`opono has submitted, this Court concludes all of the issues raised in the Arbitration Request are issues that are properly addressed in a RSA arbitration.

Because Ho`opono made a timely request for arbitration and has raised issues that may properly be considered by an arbitration panel convened pursuant to the RSA and its implementing regulations, Ho`opono will be able to have an arbitration panel consider its challenges to the process associated with the Solicitation and the award to Severson. In light of the limited scope of the case before this Court, Ho`opono is likely to succeed on the merits.

## II. <u>Irreparable Harm</u>

A party seeking a TRO "must show that he is under threat of suffering injury in fact that is concrete and

---

[13] (...continued)
necessary. <u>See</u> 34 C.F.R. § 395.30(b) ("Any limitation on the . . . operation of a vending facility for blind vendors by a department, agency or instrumentality of the United States based on a finding that such location or operation or type of location or operation would adversely affect the interests of the United States shall be fully justified in writing to the Secretary who shall determine whether such limitation is warranted."). Where a "term" of a PWS is used to exclude a blind vendor from eligibility for a contract to operate a vending facility, it is arguably a limitation, requiring written justification and a determination from the Secretary of Education. Whether that was the case with the terms of the Solicitation, as amended, is an issue for the arbitration panel, not this Court.

particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." See Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009) (citation and internal quotation marks omitted)).

Ho`opono and its licensed blind vendor, Mr. Young, are facing a concrete, particularized, actual, and imminent injury – their last day operating the MCBH dining facilities is scheduled to be May 15, 2018, and, without preliminary relief in this case, they will not operate the dining facilities during the pendency of the arbitration.[14] The injury is fairly traceable to the Marine Corps' alleged violations of the RSA and its implementing regulations because, had the Marine Corps complied with the RSA, it arguably would have awarded the new contract to Ho`opono. Further, a favorable decision in this case would prevent the injury because Ho`opono and Mr. Young would remain in place at MCBH until the arbitration is resolved.

Mr. Young receives significant compensation from his work with the MCBH dining facilities. [Errata, Exh. 3a (Decl. of

---

[14] Because the ultimate issue of whether the Marine Corps violated the RSA is not before this Court, this Court does not consider Hoopono's and Mr. Young's injuries from the loss of the new contract itself. For purposes of the TRO Motion, this Court is only concerned with the injury they may suffer while the arbitration is pending.

Stanley Young ("Young Decl.")) at ¶ 22.[15]]  Ms. Dias testified at

the evidentiary hearing that the loss of the MCBH contract would

not preclude Mr. Young from seeking other blind vending

opportunities through Ho`opono.  Mr. Young states he was selected

to operate another blind vending facility, but the transfer

process has not happened because of the uncertainty regarding the

new MCBH contract.  Thus, he faces a loss of income when Ho`opono

is removed from the MCBH dining operations.  [<u>Id.</u> at ¶ 26.]

Further, the current MCBH contract has a significant monetary

value to Ho`opono.  As a general rule, "economic injury alone

does not support a finding of irreparable harm."  <u>Rent-A-Ctr.,</u>

<u>Inc. v. Canyon Television & Appliance Rental, Inc.</u>, 944 F.2d 597,

603 (9th Cir. 1991).  Ho`opono argues the economic losses in this

case do constitute irreparable harm because the Marine Corps'

sovereign immunity limits the available recovery in this case.

Ho`opono asserts it can only obtain prospective relief; it cannot

obtain lost income in a damages award.  Mr. Young states the

uncompensated loss of income would case him great financial harm,

from which he may never be able to recover.  [Young Decl. at

¶¶ 26-27.]

_____

[15] Ho`opono inadvertently filed an unsigned, draft version
of Mr. Young's declaration with the memorandum in support of the
Injunction Motion.  [Dkt. no. 3-21.]  Exhibit 16a is complete,
signed version.

RSA arbitration decisions are subject to judicial appeal and review, under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06, as final agency actions. <u>See</u> <u>Sauer</u>, 668 F.3d at 647 (citing § 107d-2(a)). The APA contains a waiver of the United States' sovereign immunity. 5 U.S.C. § 702 ("An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party."); <u>Bowen v. Massachusetts</u>, 487 U.S. 879, 891-92 (1988) ("the 1976 amendment to § 702 was intended to broaden the avenues for judicial review of agency action by eliminating the defense of sovereign immunity in cases covered by the amendment"). However, by the express terms of § 702, the waiver does not extend to actions seeking monetary damages. This Court also notes the Ninth Circuit has held that, "by agreeing to participate in the Randolph-Sheppard program, **states** have waived their sovereign immunity to enforcement of [damages] awards in federal court." <u>Premo v. Martin</u>, 119 F.3d 764, 771 (9th Cir. 1997) (emphasis added). The Marine Corps has not identified, and this Court is not aware of, any controlling case law establishing

that, by enacting the RSA, the United States waived its sovereign immunity from actions seeking monetary damages.

This Court therefore concludes that, even if Ho`opono prevails in the arbitration, the Marine Corps' sovereign immunity would preclude Ho`opono from recovering any monetary damages from the Marine Corps. Because of the inability to recover monetary losses incurred while the arbitration is pending, the imminent economic injury Ho`opono and Mr. Young face would be irreparable. Thus, the irreparable harm factor weighs in favor of granting the TRO.

## III. **Balancing of the Equities**

"To determine which way the balance of the hardships tips, a court must identify the possible harm caused by the [TRO] against the possibility of the harm caused by not issuing it." Univ. of Hawai`i Prof'l Assembly v. Cayetano, 183 F.3d 1096, 1108 (9th Cir. 1999).

There are remaining option periods on Hoopono's MCBH contract that the Marine Corps could exercise. At the evidentiary hearing, Ms. Carnaggio acknowledged the Marine Corps has the ability, under the RSA and the FARs, to enter into a bridge contract with Ho`opono. Thus, the Marine Corps can maintain the status quo without violating the applicable statutes and regulations.

The Marine Corps has suggested it would be harmed if a TRO is granted because, although Hoopono's services at MCBH are considered satisfactory under the PWS in the current contract, there are problems with the operations and those problems were addressed in the terms of the PWS in the Solicitation, as amended. Ms. Carnaggio's position involves contracting and procurement, [Carnaggio Decl. at ¶ 1,] and she has no personal knowledge regarding the quality of the services currently being rendered by Mr. Young and BCI at the MCBH dining facilities. This Court therefore rejects that portion of Ms. Carnaggio's testimony about problems at the MCBH dining facilities. The Marine Corps has not presented any other evidence of problems in the current operation of the MCBH dining facilities. This Court therefore rejects the Marine Corps' position that it would be harmed by unsatisfactory services at MCBH if a TRO is granted.

The Marine Corps was entitled to impose requirements in the Solicitation's PWS that were in addition to, or more stringent than, the requirements in the PWS in Hoopono's current contract. The Marine Corps argues it would be harmed by a TRO because it would not be able to impose the requirements in the Solicitation's PWS. Although the PWS in Hoopono's current contract would apply during the exercise of the options under the extension clause, the Marine Corps has not presented any evidence that it cannot negotiate additional terms which would apply

during further option periods.  For example, Ho`opono and the Marine Corps negotiated the issue of whether only United States citizens could be employed during the option periods. [Blackstone Decl. at ¶ 28.]  Further, Ho`opono and the Marine Corps would presumably be able to negotiate terms for a bridge contract, if one became necessary.  This Court therefore rejects the Marine Corps' argument that a TRO would harm it by preventing it from implementing the terms of the Solicitation's PWS.

The Marine Corps also contends it would be harmed if it is forced to enter into a bridge contract with Ho`opono because such contracts are disfavored and are not considered good procurement practice due to the lack of competition.  It is beyond dispute that competition in government contracting is, in general, beneficial and desirable.  However, the benefits of competitive contracting must be weighed with the benefits and purposes of the RSA.  Further, once Ms. Carnaggio eliminated Hoopono's Proposal from consideration, Severson was the only other offeror.  The process that resulted in the award to Severson – which involved including only Severson in the "competitive range," conducting further negotiations with only Severson, and allowing only Severson to submit a revised proposal – is arguably also anti-competitive.  Thus, potentially requiring the Marine Corps to enter into a bridge contract with Ho`opono to maintain the status quo while a RSA arbitration is pending does

no more to harm the Marine Corps' interest in competition than allowing it to proceed with the Severson contract.  This Court therefore rejects the Marine Corps' argument that it would be injured by the anti-competitive effect of a TRO.

The Marine Corps and Severson have expended some resources in beginning the transition to Severson's services at MCBH.  Those resources would arguably be wasted if a TRO is granted and the transition does not occur on May 16, 2018.  However, this Court finds that any injury that would be suffered by the Marine Corps and Severson if a TRO is granted is also primarily economic.  There is no evidence about the severity of Severson's economic injury if a TRO is granted.  Based on the evidence before it, the Court finds that any injury the Marine Corps and Severson would suffer if a TRO is granted is outweighed by the injury that Ho`opono and Mr. Young would suffer without a TRO.  The balance of the equities factor therefore weighs in favor of granting the TRO Motion.

## IV.  **Public Interest**

This Court has recognized the following principles relevant to the public interest inquiry:

> The plaintiffs bear the initial burden of showing that the injunction is in the public interest.  See Winter [v. Natural Resources Defense Council, Inc.], [555 U.S. 7,] 129 S. Ct. [365,] 378 [(2008)].  However, the district court need not consider public consequences that are "highly speculative."  In other words, the court should weigh the

24

> public interest in light of the likely
> consequences of the injunction.  Such
> consequences must not be too remote,
> insubstantial, or speculative and must be
> supported by evidence.
>
> . . . .
>
> Stormans, Inc. v. Selecky, 586 F.3d 1109, 1139-40
> (9th Cir. 2009) (some citations and quotation
> marks omitted).  The public interest inquiry
> primarily addresses the impact on non-parties
> rather than parties.

Am. Promotional Events, Inc.-Nw. v. City & Cty. of Honolulu, 796

F. Supp. 2d 1261, 1284-85 (D. Hawai`i 2011) (alterations in Am.

Promotional Events).

The Marine Corps' position is that it followed the FARs

and other generally applicable contracting and procurement

regulations and policies in its evaluation of the responses to

the Solicitation and the award to Severson, and the RSA priority

did not apply because Hoopono's bid was not in the competitive

range.  The public does have an interest in competitive

government contracting and procurement, but that interest would

not be significantly furthered if Hoopono's TRO Motion is denied,

allowing Severson to assume the MCBH services.  After Hoopono's

Proposal was excluded, the negotiations, the proposal revision

process, and the ultimate selection was not competitive because

Severson was the only offeror.  Thus, the award to Severson was

not the result of competitive bidding.

The public also has an interest in the furtherance of the RSA's purposes – "providing blind persons with remunerative employment, enlarging the economic opportunities of the blind, and stimulating the blind to greater efforts in striving to make themselves self-supporting."  20 U.S.C. § 107(a).  Hoopono's position in this case is that the Marine Corps violated the RSA at multiple stages of the solicitation and award process and, had the Marine Corps complied with the RSA, the contract would have been awarded to Ho`opono.  Issuing a TRO would further the RSA's purposes by preserving the status quo until the arbitration panel determines whether the Marine Corps violated the RSA.

The public interest factor therefore weighs in favor of granting the TRO.

## V.    <u>Summary</u>

Because Ho`opono has established all of the required factors, this Court concludes a TRO is warranted in this case. Hoopono's TRO Motion is GRANTED, and the Marine Corps is ORDERED to maintain Ho`opono as the food services vendor at MCBH by: 1) exercising the options under the extension clause of Hoopono's current contract; and/or 2) entering into a bridge contract with Ho`opono.  The Marine Corps must maintain Ho`opono as the food services vendor at MCBH, and the Marine Corps is prohibited from putting the MCBH contract with Severson into effect, until this Court issues its written order on Hoopono's Injunction Motion.

In addition, this Court VACATES the hearing on the Injunction Motion, which is currently scheduled for June 12, 2018, because there will be no significant changes in the circumstances of this case between the date of this Order and June 12. This Court will hold a status conference with counsel to discuss a new date and briefing schedule for the hearing on the Injunction Motion.

<u>**CONCLUSION**</u>

On the basis of the foregoing, Hoopono's Motion for Temporary Restraining Order, filed April 17, 2018, is HEREBY GRANTED. This Court HEREBY ISSUES a temporary restraining order, according to the terms set forth in this Order.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, May 11, 2018.



  /s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge


**STATE OF HAWAII, DEPARTMENT OF HUMAN SERVICES, DIVISION OF VOCATIONAL REHABILITATION, HOOPONO - SERVICES FOR THE BLIND VS. UNITED STATES MARINE CORPS, ETC; CIVIL 18-00128 LEK-KJM; ORDER GRANTING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**