| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | FOR THE DISTRICT OF HAWAII |

| | | | |
|---|---|---|---|
| 3 | | ) | CV 18-00128 LEK-KJM |
| | STATE OF HAWAII, DEPARTMENT | ) | |
| 4 | OF HUMAN SERVICES, DIVISION | ) | |
| | OF VOCATIONAL | ) | Honolulu, Hawaii |
| 5 | REHABILITATION, | ) | June 14, 2019 |
| | HOOPONO-SERVICES FOR THE | ) | |
| 6 | BLIND, | ) | MOTION HEARING PRELIMINARY |
| | | ) | INJUNCTION |
| 7 | Plaintiff, | ) | |
| | | ) | |
| 8 | vs. | ) | |
| | | ) | |
| 9 | UNITED STATES MARINE CORPS, | ) | |
| | by and through GENERAL | ) | |
| 10 | ROBERT B. NELLER, Incumbent | ) | |
| | Commandant of the Marine | ) | |
| 11 | Corps, *in his official* | ) | |
| | *capacity*, | ) | |
| 12 | | ) | |
| | Defendant. | ) | |
| 13 | _____ | ) | |

```
14

15              TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE LESLIE E. KOBAYASHI
16              UNITED STATES DISTRICT JUDGE

17   APPEARANCES:

18   For the Plaintiff:       DANIEL F. EDWARDS, ESQ.
                              Frost Brown Todd, LLC
                              One Columbus Suite 2300
19                            10 West Broad Street
                              Columbus, Ohio 43215-3484
20                            Pro Hac Vice

21                            LORI H. WADA
                              Deputy Attorney General
22                            Department of the Attorney
                              General - State of Hawaii
23                            465 South King Street Room 200
                              Honolulu, Hawaii 96813
24
     Also Present:           LEA DIAS, Party Representative
25
```

```
 1    APPEARANCES (Continued):

 2    For the Defendant:        EDRIC MING-KAI CHING
                                Assistant United State Attorney
 3                              Office of the United States Attorney
                                Prince Kuhio Federal Building
 4                              300 Ala Moana Boulevard Suite 6100
                                Honolulu, Hawaii 96850
 5
                                STEVEN FORJOHN, ESQ.
 6

 7    For the Intervenor        MATTHEW E. FEINBERG, ESQ.
      The Severson Group:       MICHELLE E. LITTEKEN, ESQ.
 8                              PilieroMazza PLLC
                                888 17th Street, N.W., 11th Floor
 9                              Washington, DC 20006
                                Pro Hac Vice
10
                                SAMANTHA M. SNEED, ESQ.
11                              ES&A, Inc.
                                Pauahi Tower
12                              1003 Bishop Street Suite 2750
                                Honolulu, Hawaii 96813
13

14

15

16

17

18

19

20

21
      Official Court Reporter:  Debi Read, CSR CRR RMR RDR
22                              US District Court, Hawaii
                                300 Ala Moana Boulevard
23                              Honolulu, Hawaii 96850

24
      Proceedings recorded by machine shorthand, transcript produced
25    with computer-aided transcription (CAT).
```

1                        I N D E X

2              CHRONOLOGICAL INDEX OF WITNESSES

3    DEFENDANTS' WITNESS                                PAGE

4

     **ROBERT SEVERSON**
5     Cross-Examination By Mr. Edwards                   14
      Redirect Examination By Ms. LITTEKEN               22
6     Recross-Examination By Mr. Edwards                 23

7

     PLAINTIFFS' WITNESS                                PAGE
8

9    **RONALD JOSEPH BLACKSTONE**
      Cross-Examination By Mr. Feinberg                  27
10    Redirect Examination By Mr. Edwards                31
      Recross-Examination By Mr. Feinberg                32

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    FRIDAY, JUNE 14, 2019                                      9:50 A.M.

2          THE COURTROOM MANAGER:  Civil number 18-00128

3    LEK-KJM State of Hawaii, Department of Human Services, Division

4    of Vocational Rehabilitation, Ho`opono – Services for the Blind

5    versus the United States Marine Corps.

6          This case has been called for a hearing on a Motion For

7    Preliminary Injunction.

8          Counsel, please make your appearances for the record.

9    Please speak into a microphone.

10          MS. WADA:  Good morning, Your Honor.

11    Lori Wada, Deputy Attorney General, with Dan Edwards, pro

12    hac vice.  And we'd like to note the presence of my client, Lea

13    Dias, on behalf of the SLA, and blind vendors David Cameron,

14    Norman Ota, Ron and Beth Flormata, Stan Young, Mary Ann

15    Nakumiji, and Jim Gashel as friends to the blind vendors, and

16    staff members from the SLA, Tad, and Mary Jane -- Andres,

17    sorry.  Tad Matsuno.

18          MR. EDWARDS:  As well as Virgil Stinnett.

19          MS. WADA:  Oh, I'm sorry.  Virgil Stinnett's here.

20          THE COURT:  All right.  Well, good morning to all of

21    you, and I welcome your clients as well.

22          MS. WADA:  Thank you.

23          MR. CHING:  Good morning, Your Honor.

24          Assistant United States Attorney Edric Ching appearing on

25    behalf of Defendant United States Marine Corps.  With me at

1   counsel table is United States Marine Corps counsel Steven

2   Forjohn.

3           THE COURT:  Good morning to both of you.

4       Mr. Forjohn, how do you spell your last name?

5           MR. FORJOHN:  F-o-r-j-o-h-n.

6           THE COURT:  -j-o-h-n?

7           MR. FORJOHN:  Yes.

8           THE COURT:  Thank you so much.  Good morning.

9       Ms. Elento-Sneed.

10          MS. SNEED:  Good morning, Your Honor.

11       Sam Sneed for the Intervenors The Severson Group with pro

12   hac vice counsel Michelle Litteken and Matt Feinberg.

13          THE COURT:  All right.  Good morning to both of you.

14          MR. FEINBERG:  Good morning, Your Honor.

15          THE COURT:  All right.  We are ready to proceed.  I

16   know there was that one issue with regard to the one

17   declaration, but my law clerk was able to find the completed

18   form in another pleading.  So since it's within the pleading

19   and files of this case, the court will use that completed

20   declaration.

21          MS. WADA:  Thank you, Your Honor.

22          THE COURT:  All right.  So I believe I had told each

23   side that they had 30 minutes.  I don't think I gave anything

24   to intervenors.

25       Do you intend to do anything other than argue or --

1      MR. FEINBERG:  Yes, Your Honor.  We have Robert

2  Severson who will testify obviously on cross-examination; his

3  deposition was submitted, and then we will argue as well.  So

4  we were hoping for the same 30 minutes.

5      THE COURT:  Yes, so you have 30 minutes as well.

6      And then if you could when you start your case, if you

7  could let me know if you want to reserve any specific amount of

8  time for argument, I'm happy to do that.  And Mr. Nakamura has

9  the timer that our court -- they can time and you can see it at

10  the podium, as well as he has a handy 2-minute sign as well as

11  a stop sign.  So --

12      MR. EDWARDS:  Your Honor, a couple housekeeping

13  matters, if I may?

14      THE COURT:  Yes.

15      MR. EDWARDS:  The parties previously agreed and I

16  believe the Court accepted that the evidence that was presented

17  at the motion for TRO would also be considered for purposes of

18  this preliminary injunction hearing.

19      A second piece, a stipulation that was filed by the

20  parties, inadvertently dropped one line which I would like to

21  read into the record as being stipulated by the parties?

22      THE COURT:  All right.  And could you have an

23  amended then stipulation so that the record's clear that

24  includes that line?

25      MR. EDWARDS:  We would be happy to.

1          THE COURT:  Okay.

2          MR. EDWARDS:  The missing piece reads as follows (as

3     read):

4          "On April 29, 2019, the Marine Corps formally requested

5     that the Department of Education convene the arbitration panel.

6     Ho`opono agreed with the Marines' April 29, 2019, request that

7     an arbitration panel should be convened and on May 20, 2019,

8     joined the Marine Corps' request to have a panel be convened.

9     As of this date the Secretary has not yet convened the

10    arbitration or responded to TSG's intervention request and has

11    not requested the parties nominate arbitrators."

12         THE COURT:  All right.  So stipulated, counsel?

13    Mr. Ching?

14         MR. CHING:  Yes, Your Honor.

15         THE COURT:  Ms. Sneed, so stipulated?

16         MR. FEINBERG:  So stipulated.

17         THE COURT:  All right.  Thank you very much.

18         MR. EDWARDS:  Also, Your Honor, with Mr. Stinnett in

19    the room, we had an exclusion of witnesses previously.  If

20    either of these parties intends to cross him and wants him

21    excluded, then I wanted to bring that to the Court's attention.

22         THE COURT:  All right.  Thank you very much.

23    Counsel, your position on exclusion -- witness exclusion

24    rule?

25         MR. CHING:  I'll defer to Mr. Feinberg.

1          MR. FEINBERG:  We don't have a problem with

2   Mr. Stinnett in the room.

3          THE COURT:  All right.  Counsel has no objection to

4   him remaining in the room despite that he will be a witness.

5          MR. EDWARDS:  And the last thing, Your Honor, was

6   that we would like to move to strike at least portions of the

7   supplemental declaration of Robert Severson, Document 83, filed

8   on May 17th after Ho`opono's reply memo.

9      Your Honor, the Severson Declaration, Document 83, is not

10  so much a declaration as it is a surreply to Ho`opono's reply

11  memo, and specifically I would bring your attention to starting

12  at paragraph 16, Mr. Severson says he has read Ho`opono's

13  briefs, and then he presents legal arguments why the positions

14  taken by Ho`opono should not be accepted by the Court, in

15  particular paragraph 16 through 20 and 25 and 26.

16         And then further, there is -- there's hearsay contained in

17  that supplemental declaration at paragraphs 12 and 13.  In the

18  case of paragraph 13, there's a printout from some undefined

19  internet search -- we don't know what the search term is.  It's

20  just a printout from the internet.  It may be from a federal

21  government cite.  I don't have reason to believe one way or the

22  other, but we'd ask that that be also stricken as hearsay.

23         THE COURT:  All right.  So I'll give you folks an

24  opportunity to brief that.  I'm not going to rule on it at this

25  time.

1      All right.  So one week for the motion to strike.  Today
2  is the 13th.
3              THE COURTROOM MANAGER:  14th, Your Honor.
4              THE COURT:  14th?  Thanks.  And so that would be by
5  the 21st; is that correct, Mr. Nakamura?
6              THE COURTROOM MANAGER:  Correct.  Yes, Your Honor.
7              THE COURT:  And then opposition, do you want one
8  week or --
9              MR. FEINBERG:  One week would be fine, Your Honor.
10             THE COURT:  All right.  So June 28th.
11     Any need for a reply?
12             MR. EDWARDS:  I wouldn't think so, Your Honor.
13             THE COURT:  Okay.  Very good.  All right.  So I'll
14  take it under advisement, and since there's no jury here, I
15  don't have to -- I can just -- if I decide to strike it, then
16  we won't rely on any of that and so forth.
17     All right.  Anything else we need to take up before we
18  start?
19             MR. FEINBERG:  Your Honor, briefly.
20             THE COURT:  Yes.
21             MR. FEINBERG:  The intervenor would move to strike
22  paragraphs 50 through 59 of the Declaration of Joe Blackstone
23  as irrelevant.  Those paragraphs were, in our opinion, or as
24  indicated by the terms, aimed at the Motion to Seal, and that
25  Motion to Seal has been rendered moot by the fact that the U.S.

1   Attorney has filed an amend -- or I guess a supplemental or

2   amended reply.

3           THE COURT:  Right.

4           MR. FEINBERG:  So those would be not relevant to any

5   issues pending before the Court.

6           THE COURT:  Okay.  Any opposition to that?  Or you

7   folks want this briefed?  This seems more housekeeping than

8   substantive, I would think.

9           MR. EDWARDS:  I don't have those paragraphs sitting

10  right in front of me, Your Honor.  I will confer with

11  Mr. Feinberg, if that's okay with the Court?

12          THE COURT:  Yes, please.  Meet and confer with

13  regard to the same, and if you could advise the court by next

14  week, in a week, by the 21st, June 21st, whether you folks are

15  in agreement with that.  And if not, then I will then issue

16  briefing schedules with regard to that.

17          MR. FEINBERG:  Thank you, Your Honor.

18          MR. EDWARDS:  Very well, Your Honor.  Thank you.

19          THE COURT:  All right.  Thank you.

20      All right.  Anything else that we need to address?

21          MR. EDWARDS:  I don't believe so, Your Honor.

22          MR. CHING:  No, Your Honor.  I'm sorry.

23          THE COURT:  All right.  Thank you very much.

24      So we will then start with the State of Hawaii.

25          MR. EDWARDS:  Your Honor, previously we --

1 obviously, we presented evidence in the Motion for TRO.  The

2 test is the same and the Court balanced the equities.

3      Really the only things that have changed since then is we

4 have an intervenor who said that they wanted to present

5 evidence of the harm to TSG.  So we believe that the record

6 already establishes all of the elements for the preliminary

7 injunction and don't have any additional affirmative evidence

8 to present at this time.

9           THE COURT:  All right.  So you submit and you

10 reserve the remaining time with regard to argument?

11           MR. EDWARDS:  And for cross-examination.

12           THE COURT:  Yes, I'm sorry, and of course for

13 cross-examination.

14           MR. EDWARDS:  Yes, ma'am.

15           THE COURT:  All right.  Thank you.

16      All right.  So, Mr. Ching and Mr. Forjohn, are you

17 planning to submit on the record as well and --

18           MR. CHING:  Yes, submit on the record, Your Honor.

19 I think I informed the Court earlier that we do not -- due to

20 the -- since we filed the stipulated set of facts, we're not

21 going to be presenting any witnesses today.

22           THE COURT:  Right.  So you just reserve your time

23 for argument?

24           MR. CHING:  Yes, Your Honor.

25           THE COURT:  All right.  Very good.

1      So, Mr. Feinberg?

2              MR. FEINBERG:  Thank you, Your Honor.  We would like

3      to reserve 15 minutes for argument.

4              THE COURT:  Okay, 15 minutes for argument.  Very

5      good.

6              MR. FEINBERG:  At this time we would call Robert

7      Severson to the stand, Your Honor.

8              THE COURT:  All right.

9      **ROBERT SEVERSON, INTERVENOR'S WITNESS, WAS SWORN**

10             THE COURTROOM MANAGER:  Please be seated.  Pull your

11     chair up.  Stay about four to five inches away from the

12     microphone.

13         Please state your first and last name, and spell your last

14     name for the record.

15             THE WITNESS:  Robert Severson, S-e-v-e-r-s-o-n.

16             THE COURT:  All right.  So the record will reflect

17     that Mr. Severson's declaration is attached to the intervenor's

18     pleading Document 62-5 filed April 12, 2019.  The court accepts

19     that as his direct evidence.

20         So we'll allow cross-examination at this time.

21             THE COURTROOM MANAGER:  I'm sorry, Your Honor.  I

22     heard counsel mention they're going to use only 15 minutes?

23             THE COURT:  Right.

24             THE COURTROOM MANAGER:  Okay.  Thank you.

25             MS. LITTEKEN:  Oh, Your Honor, there's also a

 1   supplemental declaration of Robert Severson which is ECF Docket

 2   No. 83.

 3              THE COURT:  Oh, okay.  And that's filed with --

 4              MS. LITTEKEN:  It was filed as a standalone

 5   declaration.

 6              THE COURT:  Okay.

 7              MS. LITTEKEN:  The parties were given an opportunity

 8   to submit supplemental declarations.

 9              THE COURT:  Yes.

10              MS. LITTEKEN:  If --

11              THE COURT:  Okay.  Very good.  All right.  So we'll

12   start with the cross-examination then.

13              MS. LITTEKEN:  To be clear, Your Honor, isn't this

14   part of we need to admit this into evidence?

15              THE COURT:  Yes.  So they're all received since they

16   were submitted and they're part of the pleadings.

17              MS. LITTEKEN:  Okay.  Thank you.

18              THE COURT:  Okay.  Very good.  Thanks.

19         All right.  Any cross-examination?  I'll turn first to the

20   plaintiffs.  Mr. Edwards?

21              MR. EDWARDS:  Yes, ma'am.  I would like to reserve

22   20 -- 20 minutes for argument.

23              THE COURT:  All right.  Very good.

24              MR. EDWARDS:  Does Mr. Severson -- do you have a

25   copy of your declaration, sir?

1          THE COURTROOM MANAGER:  Wait.  I'm sorry.  I have to

2     reset.  Sorry, Your Honor.

3          THE WITNESS:  No, I do not.

4          THE COURTROOM MANAGER:  So this is ten minutes.

5          MR. EDWARDS:  Yes, sir, after we get him a copy of

6     the declaration.

7          THE WITNESS:  Okay.

8                         CROSS-EXAMINATION

9     BY MR. EDWARDS:

10         Q     All right.  Then, Mr. Severson, I will get right to

11    it.  I want to ask you some questions about what you said in

12    your declaration.

13               Starting with paragraph -- what was paragraph 3 in

14    your original declaration, but I'll just ask the question.  In

15    your original declaration, Mr. Severson, you indicated that

16    because you're being deprived this contract at Kaneohe Bay, you

17    will not earn 3-and-a-half million dollars; is that correct?

18         A     Yes, that's correct.

19         Q     But that would be the revenue, approximate revenue

20    you would receive; that would not be your profit margin, would

21    it?

22         A     That's correct.

23         Q     What is your profit margin for the Kaneohe Bay

24    project?

25               MS. LITTEKEN:  Objection, Your Honor.

1           THE COURT:  Yes?

2           MS. LITTEKEN:  That's proprietary and we have

3  competitors of The Severson Group in the room.

4           THE COURT:  Okay.  I think that's a valid point.

5       What is your proposal with regard to that, Mr. Edwards?

6           MR. EDWARDS:  Your Honor, it's -- right now we're

7  trying to balance the harms, and if he is trying to claim that

8  he has a greater harm, then we need to actually know what that

9  harm is.  He's going to have to reveal the proprietary

10  information.

11           THE COURT:  I mean, it seems like the basis with

12  regard to the harm.

13           MS. LITTEKEN:  We'd want any of his potential

14  competitors to be out of the room, Your Honor.

15           THE COURT:  It's going to be on a public record,

16  though.  They can just look at the transcript or talk to their

17  counsel.

18       So with regard to that -- okay.  So why don't we do this.

19  With regard to this, is your point being that with regard to

20  the profit margin you're going to then have it compared

21  with --

22           MR. EDWARDS:  Your Honor, the point being that this

23  isn't a 3-and-a-half million dollar hit to TSG.  The hit, if

24  there is one at all, would be a profit margin, if there is a

25  profit margin at all.  We don't know if there's a profit margin

1    or not.  There may be no harm financially.

2              THE COURT:  Okay.  So let's do this.  It's a yes or

3    no question then.  Is there a profit margin?

4         Q    (BY MR. EDWARDS:)  Is there a profit margin?

5         A    I'm hoping it will be a profit margin.

6         Q    All right.  You say that you've lost an opportunity

7    to perform during the first year, the base year.  Have you

8    submitted any request to the Marine Corps to be paid the

9    approximate twenty thousand dollars of startup costs that you

10   claim to have incurred?

11        A    I did not submit a formal request to the Marine

12   Corps, but I did submit a request.  I believe it was through

13   email.

14        Q    Have you submitted any REA or claim asking for

15   payment to your company as a result of any stop order -- stop

16   work order or suspension issued by the Marine Corps?

17             MS. LITTEKEN:  Objection, Your Honor.  Compound.

18             THE COURT:  Do you understand the question?

19             THE WITNESS:  No, I didn't, Your Honor.

20             THE COURT:  All right.  Please rephrase.  Sustained.

21        Q    (BY MR. EDWARDS:)  Have you submitted any REA asking

22   for payment for work relating to any stop work order?

23        A    I don't remember.

24        Q    Have you executed any modification with the Marine

25   Corps to exercise the second year or the first option year of

1   your contract with the Marine Corps?

2       A       No, we have not.  The contract is stopped.  We -- so

3   we don't have --

4       Q       In your testimony you said you had been deprived of

5   the first year of performance; is that correct?

6       A       Yes, that's correct.

7       Q       And so if that first year has expired, has the

8   option year been exercised by the Marine Corps?

9       A       The Marine Corps gave -- gave the company a stop

10  work order, so there was no basis to -- I can't do anything

11  until this is resolved.

12      Q       All right.  You say in your declaration at

13  paragraph 5 that, "Food service management is the backbone" of

14  your company; is that correct?

15      A       Yes, that's correct.

16      Q       You list that seventh among the capabilities of your

17  company on your website, don't you?

18      A       Repeat the question.

19      Q       You list that -- you list food service as the

20  seventh item on -- of your capabilities on your website,

21  correct?

22              MS. LITTEKEN:  Objection, Your Honor.  Referring to

23  evidence not in the record.

24              THE COURT:  Well, it's certainly within his personal

25  knowledge, so I'm going to -- well, I guess you can establish

1    foundation if he knows it.

2         But do you have information on what's put on your website?

3    Are you familiar --

4              THE WITNESS:  I'm familiar with it, Your Honor,

5    but --

6              THE COURT:  Right.  Generally familiar with it,

7    right?

8              THE WITNESS:  Yes.

9              THE COURT:  You can ask him a question.  Overruled.

10    Q    (BY MR. EDWARDS:)  On your website you list food

11    service seventh among your capabilities, correct?

12    A    I never counted them, so I'm not sure --

13    Q    Okay.

14    A    -- how it's listed.

15    Q    In terms of whether food service really is the

16    backbone of your company, you've had twenty million in

17    commercial contracts for staffing with Verizon, have you not?

18    A    Again, over a period of time, yes, we probably

19    had --

20    Q    Over a period --

21    A    -- approximately --

22    Q    Over a period --

23    A    Approximately.

24    Q    -- of time you haven't had twenty million in food

25    service contracts?

 1          THE COURT:  Sorry, only one of you can speak at a

 2    time.  So if you could just wait between the question and

 3    answer.  Thank you.

 4          MR. EDWARDS:  Sorry.

 5     Q    (BY MR. EDWARDS:)  You have not had twenty million

 6    dollars worth of food service contracts over a period of time,

 7    have you?

 8     A    No.

 9     Q    With respect to federal facilities, you understand

10    the Randolph-Sheppard Act provides priority for the visually

11    impaired, do you not?

12     A    Yes, I understand that.

13     Q    Are you visually impaired?

14     A    Uhm, without my glasses I can't read, so I don't

15    know how you --

16     Q    Are you legally blind?

17     A    No.

18     Q    You are a participant in the Small Business

19    Administration's 8(a) and service-disabled veteran-owned small

20    business programs, are you not?

21     A    Yes.

22     Q    Those programs, you understand, give a preference

23    for companies like yours in federal contracting, right?

24     A    Yes.

25     Q    And to have those preferences, among other things,

1   you must be a small business, correct?

2       A    Yes.

3       Q    And you understand that Ho`opono cannot compete

4   because it is a state and not a small business for those 8(a)

5   and service-disabled veteran-owned small business set-asides?

6   Are you aware of that?

7       A    Repeat that again.

8       Q    You're aware that Ho`opono cannot compete for 8(a)

9   or service-disabled veteran set-asides in federal contracting,

10  correct?

11      A    Yeah.  I believe they have their own statute that

12  allows them to compete right along with service-disabled

13  veterans and 8(a) companies.

14      Q    For food service?

15      A    For food service contracts, yes.

16      Q    And that's the Randolph-Sheppard Act?

17      A    Yes.

18      Q    You indicated in your -- in your affidavit that you

19  were confident that you would -- in paragraph -- paragraph

20  number 6, "We were confident in our ability to be selected for

21  award" of solicitation.

22           You understood, though, that the RSA received a

23  priority at the time you submitted your bid, correct?

24      A    Correct.

25      Q    So provided they had an acceptable bid at a

1    reasonable price, even if you were the best contractor in the

2    world, it would still -- this contract would still be given to

3    Ho`opono; you understood that, didn't you?

4         A     No, I did not.

5         Q     Mr. Severson, you've chosen to compete for federal

6    contracts for food service where you know the Randolph-Sheppard

7    Act already exists to protect state licensing agencies.  You

8    know that, right?

9         A     Yes.

10        Q     So you've chosen a business model to try and -- to

11   compete with state licensing agencies for the blind even though

12   you are not legally blind yourself?

13        A     Is that a statement or a question?

14        Q     It is a question.

15        A     We're a small business and the federal government

16   gives small business an opportunity to compete for food service

17   contracts, and we use that federal government program to

18   compete in the business model that we operate in.

19              I see Ho`opono as -- if they bid on a contract, I

20   see that as they're competing for work, the same work that a

21   small business would compete for.

22              MR. EDWARDS:  I have no other questions.

23              THE COURT:  All right.  Thank you.

24         Any questions, Mr. Ching?

25              MR. CHING:  No, Your Honor.

1          THE COURT:  All right.  Redirect?

2          MS. LITTEKEN:  Yes, Your Honor, just a few.

3          THE COURTROOM MANAGER:  I'm sorry, Your Honor.

4    Redirect counsel's going to use 15?

5          MS. LITTEKEN:  Fifteen minutes for argument.  This

6    should not take more than two or three minutes.

7          THE COURT:  Okay.  So we'll give you --

8          MS. LITTEKEN:  Thank you.

9          THE COURT:  You want to put five minutes on the

10   clock or what do you want?

11         MS. LITTEKEN:  Three minutes, Your Honor.

12         THE COURT:  Okay.  Three minutes.  You got it.

13         MR. FEINBERG:  If I could jump in?

14         THE COURT:  Yes.

15         MR. FEINBERG:  To the extent that any time is left

16   over, we would like to add that to argument.  We'd want at

17   least 15 minutes.

18         THE COURT:  Yes.

19         MR. FEINBERG:  Thank you.

20         THE COURTROOM MANAGER:  Fifteen, sorry.

21         THE COURT:  Yes.

22                      REDIRECT EXAMINATION

23   BY MS. LITTEKEN:

24        Q    Mr. Severson, we were just talking about your

25   website and where food services was listed.  Are you familiar

1   with NAICS codes that are assigned to procurements?

2        A     Yes, I am.

3        Q     And is it your understanding the NAICS code for a

4   food service contract is 722310?

5        A     That's correct.

6        Q     And is that the same NAICS code as the primary NAICS

7   code for your company?

8        A     Yes, it is.

9        Q     So why is that your primary NAICS code?

10       A     Because food service is the backbone of our company

11  and what we do.  And also that's the same NAICS code that when

12  I got selected for SBA 8(a), that was the NAICS code.  That's

13  my primary NAICS code for the company.

14       Q     And when you decided to submit a proposal for this

15  procurement, was it your understanding that an offer had to be

16  acceptable to be eligible for award?

17       A     Yes.

18       Q     Is that why you thought it was worthwhile for you to

19  compete for this contract?

20       A     Yes.

21             MS. LITTEKEN:  Thank you.

22                          RECROSS-EXAMINATION

23  BY MR. EDWARDS:

24       Q     Mr. Severson, with respect to that last question,

25  you decided to compete on this contract because under

1  paragraph 6 you said you were confident in your ability to be

2  selected for award, correct?

3      A    Yes.

4      Q    Was that confidence based on information the Marine

5  Corps gave to you indicating that they intended to throw

6  Ho`opono out of the competitive range?

7           MS. LITTEKEN:  Objection, Your Honor.  Calls for

8  hearsay.

9           THE COURT:  Overruled.  It's asking for his

10  understanding or belief.

11      You may answer.

12          THE WITNESS:  Every bid that we submit, it's -- the

13  confidence that I listed here is the same.  We don't want to

14  waste time if we don't feel we're going to confidently win a

15  contract.

16      Q    (BY MR. EDWARDS:)  Did the Marine Corps tell you

17  they intended to throw Ho`opono out of the competitive range?

18      A    No.  I had no discussion with the Marine Corps.

19          MR. EDWARDS:  Thank you.

20          THE COURT:  All right.  Thank you very much,

21  Mr. Severson.  You're excused as a witness.  Please don't

22  discuss your testimony with anyone until this hearing is

23  concluded.

24          THE WITNESS:  Yes, ma'am.

25          THE COURT:  Good day to you sir.

1          Any other witnesses?

2                    MR. FEINBERG:  No other witnesses, Your Honor.

3                    THE COURT:  All right.  So intervenors rest?

4                    MR. FEINBERG:  That's correct, Your Honor.

5                    THE COURT:  All right.  Ms. Wada?

6                    MS. WADA:  To be clear, I want to make sure that

7     intervenors are not going to be cross-examining Mr. Blackstone.

8                    MR. FEINBERG:  If Mr. Blackstone is would be called

9     as a witness, we would definitely be cross-examining him.

10                    MS. WADA:  They've already been all called as

11     witnesses based on their declarations submitted.  I'm not sure

12     Mr. Feinberg understands that.  All witnesses are present

13     subject to cross-examination --

14                    THE COURT:  Right.

15                    MS. WADA:  -- but they've already testified by

16     direct through the submitted declarations.

17                    MR. FEINBERG:  I --

18                    THE COURT:  So -- so you have him here for

19     cross-examination?

20                    MS. WADA:  Well, he would be by phone by the Court's

21     permission.  So it was a housekeeping, but I just wanted to

22     make it absolutely clear that that's not what they are going to

23     do.

24                    THE COURT:  All right.  So you want him called so

25     that you can cross-examine him?

1          MR. FEINBERG:  Court's indulgence, Your Honor.

2          THE COURT:  Do you want to take a recess and kind of

3    look over who you want?  I'm sorry.

4          MR. FEINBERG:  Mr. Blackstone would be the

5    only -- yes, Your Honor, if we could have two to three minutes,

6    that would be great.

7          THE COURT:  Right.  Why don't we take a five-minute

8    recess.  You can look over it and discuss yourselves.

9      And, Warren, can you take a look at -- I'm not getting the

10   real-time.  I don't know.  The computer's not on, so --

11         THE COURTROOM MANAGER:  Oh.  Okay.

12         THE COURT:  That's okay.  I mean --

13         THE COURTROOM MANAGER:  We'll try to set it up in

14   five minutes.

15         THE COURT:  If you can, that would be great.

16     We'll take a five-minutes recess.  Let Mr. Nakamura know

17   if he needs to call Mr. Blackstone.

18     All right.  We're in recess.

19         (A recess was taken at 10:16 a.m. and

20         proceedings resumed at 10:30 a.m.)

21         THE COURT:  The record will reflect the presence of

22   counsel.

23     All right.  How are we going to proceed?  With your

24   cross-examination, Mr. Feinberg?

25         MR. FEINBERG:  Yes, Your Honor.  We'd like to

1   cross-examine Mr. Blackstone.

2         THE COURT:  And we have Mr. Blackstone available by

3   telephone; is that correct?

4       Mr. Blackstone, are you there?

5         THE WITNESS:  I am here, yes.

6         THE COURT:  All right.  Thank you.  This is

7   Judge Kobayashi.  If any time you cannot hear us or there's

8   some sort of problem with communicating with us, please let us

9   know.

10         THE WITNESS:  I will.  Thanks.

11         THE COURT:  All right.  Very good.  Your witness.

12         THE COURTROOM MANAGER:  Hold on, Your --

13         THE COURT:  Oh, yeah.  Swear in the witness.  Thank

14  you.

15         THE COURTROOM MANAGER:  Although you cannot see me,

16  please raise your right hand.

17         THE WITNESS:  It's up.

18  **RONALD JOSEPH BLACKSTONE, PLAINTIFF'S WITNESS, WAS SWORN**

19         THE COURTROOM MANAGER:  Please state your first and

20  last name, and spell your last name for the record.

21         THE WITNESS:  Ronald Joseph Blackstone, and it's

22  B-l-a-c-k-s-t-o-n-e.

23         THE COURT:  All right.  Your witness.

24       MR. FEINBERG:  Thank you, Your Honor.

25                     CROSS-EXAMINATION

1   BY MR. FEINBERG:

2       Q     Good morning or afternoon where you are,

3   Mr. Blackstone.  My name is Matt Feinberg.  I'm counsel for

4   the intervenor, The Severson Group.  How are you doing?

5       A     I'm good.

6       Q     You're familiar with the Randolph-Sheppard Act,

7   correct?

8       A     I am familiar with the Randolph-Sheppard Act.

9       Q     Okay.  With your knowledge, you are aware that the

10  Randolph-Sheppard Act priority only applies to offerors whose

11  proposals are included in the competitive range of a

12  procurement, correct?

13      A     That's my understanding.

14      Q     And you're familiar with the solicitation in this

15  case, correct?

16      A     Which solicitation?

17      Q     The solicitation for the food service program at

18  Marine Corps Base here in Hawaii.

19      A     I am.

20      Q     And you're aware that the solicitation for this

21  procurement says that offerors deemed technically unacceptable

22  will be disqualified from being in the competitive range?

23      A     Uhm, I know that that's generally the case.  I'm not

24  a hundred percent certain that I read that for this one, but I

25  believe so.

1     Q    And that's consistent with the Randolph-Sheppard

2 Act, correct?

3         MR. EDWARDS:  Objection.

4         THE WITNESS:  Uh, yes.

5         MR. EDWARDS:  Calls for legal conclusion.

6         THE COURT:  I'm sorry?

7         MR. EDWARDS:  Objection.  Calls for legal

8 conclusion.

9         THE COURT:  All right.  Overruled.  If he can give

10 us his understanding, he's indicated he understands the

11 Randolph-Sheppard Act.  So within his understanding, not

12 necessarily a legal interpretation of the statute.

13     All right.  So do you want to re-ask the question?  Did he

14 answer it?  I'm sorry.

15         MR. FEINBERG:  He did answer, he said, "Yes."

16         THE COURT:  All right.  Thank you.  Next question.

17     Q    (BY MR. FEINBERG:)  And you admit that Ho`opono is

18 deemed technically unacceptable and excluded from the

19 competitive range in this procurement, correct?

20     A    That was my understanding.

21     Q    The parties have stipulated here that there's a

22 bridge contract of four million dollars and the blind vendor

23 receives up to 9,000 monthly from net profits from that bridge

24 contract, correct?

25     A    That's incorrect.

1    Q    Uhm, how is that incorrect, sir?

2    A    Because he has a percentage of the profit in

3    addition.

4         MR. FEINBERG:  Court's indulgence, Your Honor.

5     Geez, it's right in front of me.

6    Q    (BY MR. FEINBERG:)  Are you aware, Mr. Blackstone,

7    that in this case Mr. Virgil Stinnett filed a declaration?

8    A    I'm not aware.  I'm sure that he may have.

9    Q    Okay.  I'm going to read from Mr. Stinnett's

10   declaration just a brief sentence.  I'm going to see if you

11   agree or disagree with the statement.  For your reference, I'm

12   reading from paragraph 14 of Mr. Stinnett's declaration.  It

13   states, "My anticipated monthly compensation from Kaneohe Bay

14   Marine facility, MCBH, is a draw of approximately $9,000."

15        Is that correct?

16   A    That is correct.  But that does not total what he

17   will get in compensation.

18   Q    He could receive less, correct?

19   A    In all probability he will receive more.

20   Q    Is it your testimony that he's expected to receive

21   an average of $9,000 per month?

22   A    No.  He's to receive a draw of $9,000 against the

23   profit that he's anticipated to receive.

24   Q    And what's your estimate of the amount he's

25   anticipated to receive in total for the one year bridge

1    contract?

2         A      I don't have a estimate 'cause, obviously, you know,

3    profit is something that's not known in terms of the future and

4    things of that nature.

5         Q      Okay.  But you agree with Mr. Stinnett's statement

6    in his declaration that he is to receive a draw of $9,000 per

7    month?

8         A      He does receive a draw of $9,000, correct.

9         Q      Okay.  And Blackstone Consulting receives the

10   remainder of the net profits on this contract, correct?

11        A      That is incorrect.

12        Q      So if the -- if there is -- if his share -- if

13   Mr. Stinnett's share of net profits is removed from this

14   contract, Blackstone Consulting receives the remainder; is that

15   correct, sir?

16        A      That is correct.

17             MR. FEINBERG:  Thank you.

18        No further questions, Your Honor.

19             THE COURT:  Any redirect?

20                         REDIRECT EXAMINATION

21   BY MR. EDWARDS:

22        Q      Mr. Blackstone, Dan Edwards here.  Real quick --

23        A      Hello.

24        Q      -- from the money that you receive on the Marine

25   Corps contract, is the first of that money used to pay the

1    employees?

2         A      Yes.

3         Q      So in terms of what is received, a portion of the

4    profits goes to Mr. Stinnett and a portion goes to BCI?  Is

5    that what you were trying to explain?

6         A      That is correct.

7              MR. EDWARDS:  Thank you.

8              THE COURT:  Any recross?

9              MR. FEINBERG:  Just very briefly, Your Honor.

10                            RECROSS-EXAMINATION

11   BY MR. FEINBERG:

12        Q      Mr. Blackstone, this is Mr. Feinberg again.  Are you

13   aware that the parties have entered into a stipulation that was

14   presented to the Court for this hearing?

15             MR. EDWARDS:  Your Honor, I would object that this

16   is beyond the scope of my redirect.

17             THE COURT:  It is beyond the scope.

18        What particular part of the stipulation?

19             MR. FEINBERG:  I'm addressing paragraph 4 of the

20   stipulation.

21             THE COURT:  Okay.  I don't have it in front of me,

22   so what's the --

23             MR. FEINBERG:  I can read it for you.  It says, "The

24   licensed blind vendor" --

25             THE COURT:  Read it slowly, make sure we get it all

1    in the record.

2           MR. FEINBERG:  (Reading:) "The licensed blind vendor

3    receives its share of net profits which average up to $9,000 a

4    month under the bridge contract."

5           THE COURT:  Okay.  So that goes to what portion goes

6    to Mr. Stinnett?

7           MR. FEINBERG:  Yes.

8           THE COURT:  All right.  So I'll permit it.  So

9    you're asking Mr. Blackstone if he's aware of that?

10          MR. FEINBERG:  Correct.

11     Q     (BY MR. FEINBERG:)  Are you aware of that statement

12    in the stipulation, Mr. Blackstone?

13     A     Not aware of that.  I've not seen that stipulation.

14     Q     I'm sorry.  I don't think I heard the first part of

15    your sentence.

16     A     I'm not aware of it.  I don't think I've seen that

17    stipulation.

18          MR. FEINBERG:  Okay.  Thank you, Your Honor.

19          THE COURT:  All right.  If nothing further, then I'm

20    going to excuse Mr. Blackstone.

21     Good day to you, sir.

22          MS. WADA:  Hi, Joe.

23          THE WITNESS:  Thank you.

24          THE COURT:  Any other witnesses that we need to call

25    for cross-examination?

1          MR. FEINBERG:  Not for cross-examination from the

2     intervenor, Your Honor.

3          MR. CHING:  Nothing, Your Honor.  No witnesses.

4     Thank you.

5          THE COURT:  All right.

6          MR. EDWARDS:  No, Your Honor.

7          THE COURT:  So everyone rests then in terms of the

8     evidentiary portion?

9          MR. FEINBERG:  Yes, Your Honor.

10          THE COURT:  All right.  Very good.  Then we'll turn

11     to the argument portion.

12          Poor Warren, you're the account keeper.  So everyone tell

13     Warren how much time you think you have and then he'll be able

14     to put that on the clock.

15          And then what I'm also going to do is permit you an

16     opportunity to file written closing briefs, very short ones, so

17     that you can highlight what you want to say.  But more

18     importantly, if there's any particular exhibit that you want

19     the court to take into account that you did not file with your

20     briefs for the hearing, i.e., that was entered into evidence at

21     the TRO hearing, because we accept those into evidence, but we

22     don't file them.  Okay.  So I don't actually have physical

23     copies of them my law clerk kindly reminded me during the

24     break.

25          So if you have an exhibit that you want me to reply on

1    that was entered into evidence in the hearing, or if you want

2    to refer to particular evidence with regard to that that was at

3    the TRO hearing, that's from the transcript, then I'll give you

4    an opportunity to attach that to the argument.

5         In other words, the argument part is going to be real

6    short, written, but any exhibits you want the court to take a

7    look at.

8         Also, if it's already filed in the record, that is, the

9    docket, you don't need to attach that.  But if you could refer

10   to the docket number, the court can then turn to the docket

11   number and we don't have to kill as many trees with regard to

12   that.

13        So I will get a packet from you that literally will be ten

14   pages of argument and then whatever you want to point out to

15   the court of the either declarations, testimony at the TRO

16   hearing, exhibits from the TRO hearing, et cetera, those would

17   be either attached or referred to.

18        Ms. Wada, do you have a question?

19            MS. WADA:  Yes.  Just for clarification, that

20   ten-page written argument, would that be in addition to

21   whatever orally is argued today?

22            THE COURT:  Correct.

23            MS. WADA:  Thank you.

24            THE COURT:  Well, I don't want you to have any new

25   arguments when I say that, but I'll give you an opportunity to

1  say, you know, We made these five arguments, you know, at the

2  hearing, and here's our support for it.  And then you can

3  address that to the court.

4      Bullet points are fine.  This is not something that we're

5  going to have to bluebook and give -- you know, you need to

6  give me something that's going to be, you know, published in a

7  law review article.  But I'll give you a chance to highlight it

8  and then document it with exhibits, et cetera.

9          MS. WADA:  Thank you for --

10          THE COURT:  Does that make sense?

11          MR. FEINBERG:  Yes.  Thank you, Your Honor.  Just

12  wanted to clarify the due date for that submission.

13          THE COURT:  Yes.  How much time would you like?  I

14  know you guys are going to possibly file the things that we

15  talked about earlier on the motions to strike.  You want, like,

16  three weeks?

17          MR. EDWARDS:  I think that should be fine.

18          MR. FEINBERG:  Three weeks would be fine, Your

19  Honor.

20          MR. EDWARDS:  Maybe less.  I think 4th of July

21  vacation comes before that.

22          THE COURT:  Oh, that's true, that's true, yeah.

23  Let's look at the calendar.  So, yeah, three weeks would take

24  us to --

25          THE COURTROOM MANAGER:  July 5.

 1          THE COURT:  -- July 5th.  So you're right, you'd

 2   have to be over the 4th of July weekend.  Or we could do it

 3   like the 9th which is the Tuesday after the 4th of July if you

 4   need that time in terms of getting the documents together.  Or

 5   we can do it earlier.  It's up to you folks.

 6          So maybe you want to think about that a little bit.  We'll

 7   go into oral argument and then you can let me know with regard

 8   to that.

 9          Now this would be simultaneous.  It's not going to be like

10   an opening and a rebuttal and so forth.  All right?

11          MR. EDWARDS:  About how long will it take for the

12   transcript?  Not that there's a lot of evidence here, but that

13   might be relevant as well.

14          THE COURT:  Well, my court reporter's going to be

15   doing the Kealoha trial next week, so she's going to be having

16   her hands pretty full, I think.  So if you want to wait until

17   the transcript, then, you know, we'll probably have to give a

18   deadline of like six weeks from now so that you can look at the

19   transcript 'cause she's going to be the court reporter for

20   Kealoha and that's going to go a full week.

21          MR. EDWARDS:  I think it's going to be safer that

22   way.  I don't know that it's really necessary.

23          THE COURT:  That's fine, too.  I mean --

24          MR. EDWARDS:  You know, I don't want to hold

25   anything up, but --

             1          THE COURT:  Okay.  So why don't we do this.  Why

             2   don't we go into the oral argument now.  We'll take a recess,

             3   I'll consult with her, and then we'll give you -- talk about

             4   some deadlines with regard to that.

             5          MR. EDWARDS:  Thank you.

             6          THE COURT:  Okay.  All right.  So --

             7          MS. WADA:  Plaintiff.

             8          THE COURT:  -- plaintiffs.  Is it Mr. Edwards who's

             9   going to be giving that?

            10          MS. WADA:  Yes, ma'am.

            11          THE COURT:  All right.  I believe you have

            12   20 minutes; is that correct?  Or 15?  I can't remember.

            13          MR. EDWARDS:  I'm not sure how much -- I did not use

            14   the ten for cross-exam -- at least I didn't think so.

            15          THE COURTROOM MANAGER:  Correct.

            16          MR. EDWARDS:  What do I have, Warren?

            17          THE COURT:  I think you had asked to reserve

            18   20 minutes for argument and I think you didn't use all of

            19   yours.  So you want 20?  25?  What do you want?

            20          MR. EDWARDS:  That should be fine.  I would like to

            21   reserve five for rebuttal.

            22          THE COURT:  Okay.  So 15 and 5, does that sound

            23   good?

            24          MR. EDWARDS:  Should be enough, Your Honor.

            25          THE COURT:  Okay.  Very good.


                              UNITED STATES DISTRICT COURT

1          THE COURTROOM MANAGER:  Five minutes is on the

2     clock.

3          THE COURT:  Okay.  So he wants to reserve five

4     minutes for rebuttal.  So, Warren, five minutes for rebuttal.

5     So he's going to take -- yeah, you can give him 20 minutes,

6     then five minutes --

7          THE COURTROOM MANAGER:  20 minutes.  Okay.

8          MR. EDWARDS:  Very well.  Thank you, Your Honor.

9     Your Honor, as you know, you've already considered this

10    issue.  You considered it last year and you considered it

11    against the same test, but substantially more evidence

12    presented at the TRO hearing than today.  And that's because

13    TSG intervened with the specific purpose that they wanted to be

14    able to argue that The Severson Group had suffered some type of

15    damage that was not presented by the Marine Corps.

16    And so I have my 30 minutes, I have two folks who have

17    30 minutes, but I still think that it's a pretty

18    straightforward argument to present.

19    The Marine Corps has presented a unique new argument

20    related to jurisdiction.  I would emphasize only -- with

21    respect to that argument, I'd just emphasize one thing, and we

22    point this out in our reply.  The argument that they've

23    presented to you has already been presented in the *Eastern

24    District*, which of course is not controlling here, but it is

25    really the most factually analogous situation.  The *Oklahoma

 1   case that they are citing isn't nearly as factually analogous

 2   as is the *Georgia Vocational Rehabilitation* case from Virginia.

 3   So we think that Judge Morgan had a very well-reasoned decision

 4   there.  We'll refer you to that and rely on our papers as it

 5   relates to that briefing.

 6        And I have had a conversation with Mr. Ching.  We don't

 7   consider this to be plagiarism.  We may have used that word in

 8   our -- in our brief, but really, you know, people use brief

 9   banks all the time.  I have done that.  Everyone does.  But the

10   important point is if you're going to recycle a brief that has

11   a decision with it, in candor, I think you need to tell the

12   Court why your case should be different than in this case the

13   *Georgia Rehabilitation* or *Georgia Vocational* case.

14        So I want to get to the merits.  We've got a four-part

15   test.  The standard is the same as the temporary restraining

16   order and I'd like to start with the harms.

17        In this case, Ho`opono has suffered an irreparable harm.

18   Sovereign immunity, as laid out in the *Kansas* case, does bar

19   any recovery of monetary damages by Ho`opono.  And so they do

20   suffer financially as well as have no way to be compensated for

21   that.

22        The other part here -- and this goes back to Lea Dias's

23   testimony in the TRO hearing -- every single one of these

24   contracts is important for giving remunerative opportunities to

25   the legally blind.  We have several of them here today.  There

1    are more blind vendors in Hawaii than there are spots to put

2    them in, and that is why this is so critical.

3        The Randolph-Sheppard Act is focussed in on helping the

4    blind vendor.  It's not focussed in on 8(a) contractors.  It's

5    not focussed in on service-disabled veterans.  Mr. Severson is

6    choosing to compete in a space where the playing field is not

7    even.  It is to his disadvantage.  As long as the State

8    Licensing Agency can meet a minimum threshold of capability

9    with a reasonable price, the Randolph-Sheppard Act priority

10   kicks in, and that is why you don't see a lot of people who

11   claim to have confidence that they're going to win a contract

12   where the SLA already has that benefit.

13       By contrast, the harm that The Severson Group is suffering

14   is purely financial.  They do have a contract, even though it's

15   not being performed, and under the stop work order they have a

16   right to recover money damages from the Marines.  And in

17   fact -- and I'm sure that Severson will argue otherwise -- but

18   the law on that says that they're entitled to receive profit as

19   well.

20       So they don't have past performance, but they do have

21   profit that they are able to recover.  And TSG in its

22   declaration said that they were continuing to bid on other

23   projects.  They didn't say that they were losing other projects

24   because they lack sufficient past performance at Kaneohe Bay.

25       The other point here is -- that's been raised by TSG is

1       the suggestion that the blind vendor really isn't doing much,

2       that they're not making much money here.  It's characterized as

3       three percent in their brief, and that's just flat wrong.

4           What they've done is they've confounded revenues and

5       profits because they claim in Mr. Severson's declaration that

6       he's losing 3-and-a-half million dollars.  Well, that's not his

7       profit.  He doesn't even know if he'll make a profit according

8       to his testimony here.  So he may actually have no financial

9       harm -- at least there's no record of it.

10          By comparison, the three percent that they are

11      manufacturing, it goes to that $9,000 number, give or take.

12      That's monthly that keeps Mr. Stinnett in business, that pays

13      his bills.  That is his livelihood and that keeps the blind

14      vendor program going and serves the purpose for which Ho`opono

15      was established.

16          In addition to the harms, we have to look at the potential

17      for success on the merits.  When you ruled on the TRO, you

18      found that it was likely that Ho`opono would have an

19      arbitration convened.  We are a year later; the arbitration has

20      not been convened.  We have been pestering the Department of

21      Education.

22          But what I want to point out, Your Honor, is that there

23      are three federal agencies that are involved.  The Department

24      of Justice is here, which is part of our executive branch, the

25      Marine Corps is part of this case which is part of the

1    executive branch, and the Department of Education is part of

2    our executive branch.  We would like the arbitration to be

3    convened, there's no question, and we expect that it will, but

4    we can't put this case in a position where the executive could

5    simply maneuver its agencies to preclude the remedy of

6    arbitration, and that's why this preliminary injunction is so

7    critical to motivate the executive branch to get this

8    arbitration going.

9        The Marine Corps asked on April 29th for that to get

10   moving.  This was after they filed their brief in opposition to

11   our motion for preliminary injunction.  Just from a timing

12   perspective, they said in that motion that they felt that all

13   seven opportunities had been exhausted at that point.  So

14   according to their motion, they indicated that it was March

15   where they felt that everything was exhausted, and so April

16   they've asked, May we've concurred.  We're hoping to hear

17   something even today in response to the emails to Jesse Hartle.

18       Besides the merits of we are going to eventually have this

19   arbitration, Ho`opono is going to prevail in that arbitration.

20   You've got a couple of things here.  Last year Eileen

21   Carnaggio, the former contracting officer, testified that the

22   reason she wouldn't directly negotiate with Ho`opono was

23   because competition is the backbone, it is the -- the purpose

24   for which Marine procurement exists.

25       Then she testified she threw out the one priority vendor,

1    Ho`opono, and she made an award to the only other vendor.  That

2    only other vendor, TSG, engaged in discussions with her --

3    that's a term of art in government contracting -- and they

4    submitted a final proposal revision to her.

5        Ho`opono was not permitted discussions.  Ho`opono was not

6    permitted a final proposal revision.  And in Exhibit 11 on

7    page 10 of 90, which, obviously, you don't have with you, it

8    lays out what the Marine Corps was supposed to do.

9        One of the challenges with Randolph-Sheppard Act is

10   there's two rails.  There is a FAR rail under the Federal

11   Acquisition Regulation and there is the Randolph-Sheppard Act

12   rail under the Randolph-Sheppard Act in its regulations.

13   Sometimes those rails get mighty narrow and sometimes

14   contracting officers write solicitations that force them to

15   bang into one or the other.

16       And here what we have is the RSA priority was supposed to

17   be -- supposed to be applied under the terms of the

18   solicitation after discussions and after final proposal

19   revisions.  So when Ho`opono isn't permitted to have that,

20   they're not getting the priority.

21       Further to that, as you found in a footnote -- and I'll

22   have to find where that footnote is -- Docket 32, pages 16 and

23   17, your footnote No. 3, under the Randolph-Sheppard Act

24   regulations, 34 C.F.R. 395.30(b), any time there's a

25   limitation -- and here we've got two limitations that were

1  actually used to throw out the blind vendor from the

2  competitive range -- but any time there's a limitation, the

3  first thing that has to happen is that the contracting officer

4  has to make written findings, and Eileen Carnaggio testified

5  she never made written findings.  The written findings that she

6  has to make have to say that without -- that in the absence of

7  the limitation, it would be adverse to the interests of the

8  United States of America.

9       Seems pretty high standard, but when you don't make any

10 written finding at all, it's a real easy conclusion for this

11 Court to make that she violated the Randolph-Sheppard Act.

12      Once those written findings, if any, are made, they have

13 to be submitted for concurrence to the Secretary of Education.

14 We don't have that here either.

15      So I think there are two reasons on the merits that you

16 will see that Ho`opono should prevail here in the arbitration

17 itself because the priority that was announced in the

18 solicitation was not followed and applied, and because the

19 limitations contained in the solicitation were not properly

20 coordinated through the Randolph-Sheppard Act.

21      There are other -- there's an abundance of procurement

22 cases, but they're really irrelevant because this is a

23 Randolph-Sheppard Act case.  You often hear the United States

24 argue that, Well, you didn't protest, you didn't file a protest

25 at the GAO.  A contractor or a prospective -- a prospective

1    offerer can make protest to the GAO, that's absolutely what

2    they can do under the FAR, but the Randolph-Sheppard Act stands

3    alone, and under the Randolph-Sheppard Act, arbitration is

4    the -- is the methodology.

5         So there may be two rights to complain about the

6    solicitation.  Here Ho`opono is properly complaining about it

7    through the arbitration process at the Department of Education.

8         I think the last issue in terms of the harm to the public,

9    I don't believe there is any harm to the public of having

10   Ho`opono and Virgil Stinnett continue to provide food service

11   to the Marine Corps as he has been doing now for a while.  He

12   took over for Stan Young, as you know.  Mr. Young has moved to

13   another opportunity.  There's a line of vendors waiting to take

14   the next one and always trying to find another opportunity to

15   continue in this program.

16        The Marines are being fed.  The employees who are working

17   for this blind vendor are being paid.  The employees who are

18   working for this blind vendor, if they're kicked out, the

19   employees probably go and work for the next non-blind vendor, I

20   mean, or the next blind vendor.  The work force is

21   comparatively stable.  It's the entity that is managing the

22   work force that has a tendency to sometimes change.

23        So, Your Honor, if you don't -- if you have any questions,

24   I'd be more than happy to entertain it.  I love it when I go

25   under time and usually judges would prefer that as well.

 1          THE COURT:  Well, just with regard to the

 2   replacement by Mr. Stinnett of Mr. Young, you know, argument

 3   has been raised that now that the plaintiff has really changed

 4   as a result, and, you know, that they're interchangeable, that

 5   Mr. Young has gone on and has gotten a very good position I

 6   believe at the airport with that contract.  So, you know,

 7   where's the harm with regard to that?  'Cause he was able to

 8   get another position.  What's your response?

 9          MR. EDWARDS:  Let me touch on that.  Yeah, I'd be

10   happy to.  The contract here is with Ho`opono.  It is not with

11   Mr. Young and it is not with Mr. Stinnett.  And that is

12   important because Ho`opono has to have the flexibility to bring

13   in vendors and move vendors along the way as they become better

14   trained.  As they become better and more capable, they've got

15   to have somewhere more to go because at the bottom of the

16   program you've got some of the lesser -- less lucrative, you

17   know, vending machines and those types.  And the goal of this

18   program is to grow that capability so men like Mr. Young and

19   Mr. Stinnett can become entrepreneurs and, you know, solve the

20   problems of -- that the Randolph-Sheppard Act is there to

21   solve.

22          THE COURT:  So your position is with regard to that

23   is Ho`opono is actually the contract holder and Ho`opono -- as

24   long as the person who's administering the contractual

25   responsibilities, i.e., in this position Mr. Stinnett,

1    qualifies under the Randolph-Sheppard Act, it's not the

2    individual who's actually doing the contract work, but as long

3    as that person qualifies for Randolph-Sheppard Act and

4    Ho`opono's qualifications for their training program, that's

5    the issue?

6              MR. EDWARDS:  Exactly.

7              THE COURT:  And there's nothing been raised with

8    regard to that Mr. Stinnett does not qualify?

9              MR. EDWARDS:  That is correct, yes.  That is our

10   position, absolutely, because the program is -- is Ho`opono's

11   program to run and to administer and to grow.

12             THE COURT:  Right, to qualified individuals.

13             MR. EDWARDS:  Yeah, through the qualified

14   individuals --

15             THE COURT:  Yeah.

16             MR. EDWARDS:  -- which -- well, I haven't run out of

17   time, I'll throw this in as well.  Because the other part of

18   that is there seems to be an attack on the partnership with the

19   Blackstone Consulting Group.  And the fact of the matter is

20   that Ho`opono gets to choose who is going to be a teaming

21   partner and not what is going to be in the best interest of the

22   blind vendor.  That's not at issue in this case.  It shouldn't

23   be at issue in this case.  I don't think it would be within

24   this Court's jurisdiction to decide who can and cannot be a

25   teaming partner.

1          THE COURT:  Right.

2          MR. EDWARDS:  But Blackstone has served that purpose

3   and has served it well.

4          THE COURT:  All right.  Thank you very much.

5          MR. EDWARDS:  Thank you.

6          THE COURT:  All right.  Mr. Ching.

7          THE COURTROOM MANAGER:  Your Honor, should I put

8   25 minutes?

9          MR. CHING:  Your Honor, I won't be using more than

10  five to seven minutes.

11         THE COURT:  All right.  Thank you very much.

12         THE COURTROOM MANAGER:  I'll put 25 in.

13         MR. CHING:  Thank you, Mr. Nakamura.

14     Your Honor, just to reply to counsel's arguments, in his

15  reply there is a -- a accusation, plagiarism, against myself,

16  you know, with regard to doing the brief.  The cases he cited

17  was -- were not on point.  They involved a counsel using a

18  judicial opinion and not citing to it, Your Honor.

19         THE COURT:  Right.

20         MR. CHING:  And I think this case is just the

21  Department of Justice, akin to a big law firm, using arguments

22  in different cases.  Some we lose and some we win, and, you

23  know, to be candid, most -- many more that we lost, you know,

24  Your Honor.  And now it seems like the argument against myself

25  has moved from plagiarism to lack of candor.

1    Your Honor, I don't think I've ever seen anybody in briefs

2    in tort cases, APA cases, employment cases ever cite or inform

3    the court that I've used this brief in 17 different cases and

4    this is the record, 8 and 9 or something to that effect.

5            THE COURT:  I agree.  I hope they don't hold judges

6    to that either because we definitely, you know, reuse forms in

7    terms of standards, et cetera, and especially on motions for

8    reconsideration.  So I certainly don't.  And you've always

9    been, you know -- especially in your office, even among your

10   peers, have always been remarkable and I think stood out for

11   your candor to the Court and your cooperation and collegiality.

12   So I disregarded it.

13       So to the extent you feel you need to address it, I'm

14   happy --

15           MR. CHING:  Oh, no.  That's all, Your Honor.  I'm

16   just going to move -- I just have a few more points.

17       Your Honor, at this point, you know, we cited the *Oklahoma*

18   case.

19           THE COURT:  Yes.

20           MR. CHING:  And counsel then cited the *Eastern*

21   *District of Virginia*, and I believe that, you know, at this

22   point, you know, without that independent -- that independent

23   basis for jurisdiction, the United States would request at this

24   point that the Court adopt the holding of the *Oklahoma* case.

25       And, you know, of course we do acknowledge that

1    there's -- there have -- probably have been more courts,

2    district courts throughout the country who have gone the

3    opposite direction, but we -- you know, we encourage the Court

4    to adopt it.

5         And then we rely upon our written pleadings, so I'm not

6    going to argue that.

7              THE COURT:  Okay.

8              MR. CHING:  Your Honor, with regard -- counsel

9    referenced Ms. Carnaggio's testimony at the last hearing, and,

10   you know, the way he makes it sound as if this was a slam dunk

11   and is predetermined.  But, Your Honor, did she -- she did

12   testify that the reason why that Ho`opono was not awarded the

13   contract was they were not in the competitive range, and that

14   the reason for that was in her determination they did not meet

15   the minimum technical standards.  And I believe also she

16   testified that Ho`opono never objected to the standards that

17   were given.  So I just wanted to point that out, Your Honor.

18        And based on that, we're just going to rely on our written

19   pleadings.

20             THE COURT:  All right.  Thank you very much.

21             MR. CHING:  Okay.  Thank you.

22             THE COURT:  All right.  Mr. Feinberg.

23             MR. FEINBERG:  May it please the Court, Your Honor.

24             THE COURTROOM MANAGER:  I'm sorry, Your Honor.  Is

25   it 25 minutes or 20 minutes?

1          MR. FEINBERG:  I probably only need 20.

2          THE COURTROOM MANAGER:  20.

3          MR. FEINBERG:  Yeah.  Thank you.  May it please the

4    Court, Your Honor, I do -- before I get into my formal

5    argument, I want to address some of the points that were made

6    in the plaintiff's argument.

7          First there is an allegation that the plaintiff has been

8    pestering the Department of Education to empanel the

9    arbitration panel.  That's simply not true.  The Marine Corps

10   named its arbitrator in June 2018 after arbitration was

11   requested, I believe, in April or May of 2018.  Nothing was

12   done.  The Department of Education has not ruled on The

13   Severson Group's two separate requests to intervene.

14         Finally, exasperated, the Marine Corps sent a letter to

15   the Department of Education saying Let's get a move on.  It was

16   only after the briefs had been filed in this case that attacked

17   the plaintiffs -- what we would characterize as delay

18   tactics -- that's when this position changed.  That's when they

19   said, Yes, we agree with you, this arbitration panel should be

20   convened.  So the fact they say they've been pestering things,

21   that's a brand new position for them.

22         There is also an allegation, at least by innuendo, that if

23   a -- if an injunction was not entered, somehow the plaintiff

24   would lose its opportunity to arbitrate.  That's simply not the

25   case.  This arbitration is going to take place, maybe in six

1    months, maybe in a year, maybe in three years depending on how

2    fast things go, but that ruling today will not impact the fact

3    that that arbitration will take place.  The only thing that

4    will remove it is a motion to dismiss filed in the arbitration

5    or a withdrawal of the arbitration.

6         THE COURT:  Right.  So that's not something that the

7    court takes into its calculus, would you agree?

8         MR. FEINBERG:  I would agree with that.  I just

9    wanted to clarify for the record to make sure we're all on a

10   level playing field.

11        THE COURT:  Yes, I agree.

12        MR. FEINBERG:  One of the arguments that has been

13   raised that this procurement did not fall within the

14   Randolph-Sheppard Act is that the solicitation itself was not

15   drafted correctly in line with Randolph-Sheppard Act.  That

16   argument is untimely.  Under *Blue & Gold Fleet, L.P. v. U.S.*,

17   which is 492 F.3d 1308, that's a federal circuit case from

18   2007, if a party has a problem with the language of the

19   solicitation or the manner in which a -- the evaluation will

20   take place, the time for filing the protest or challenging the

21   solicitation is before the solicitation -- the proposals have

22   been submitted.  That didn't happen here.

23        My reading of the transcript of Ms. Carnaggio's testimony

24   was consistent with that, and she explained that she proceeded

25   under the direct terms of the solicitation because there was no

1    challenge to the termination of the solicitation at the time.

2         But getting into my argument, an injunction is an

3    extraordinary remedy, and the Supreme Court has reiterated many

4    times that a preliminary injunction may only be awarded upon a

5    clear showing that the plaintiff is entitled to such relief.

6    That clear showing must be made by establishing the standard

7    four factors:  likelihood of success on the merits, irreparable

8    harm, that the plaintiff's harm is more significant than the

9    harm suffered by the other parties in an -- if an injunction is

10   denied, and that the public interest will be served by entry of

11   an injunction.

12        A temporary injunction, like the one entered previously in

13   this case, and the preliminary injunction are designed to

14   preserve the status quo until a full hearing can be held to

15   flush out all of the facts and determine whether the

16   plaintiff's petition has made that clear showing of the four

17   elements.

18        Plaintiff has not made the clear showing that is necessary

19   here, and in fact, after the TRO was entered, it changed the

20   status quo without leave of Court and without the consent of

21   the parties, thereby calling into question whether a TRO or PI

22   should have been continued from that point on.

23        First addressing the likelihood of success on the merits,

24   I think it's important to recognize that both the intervenor

25   and the plaintiff cite the same case in their briefs,

1     intervenor from its opposition and plaintiff in one of its two

2     replies. And that case is *Kansas v. United States.* It's 171

3     Fed.Supp. 3d 1145. It's from the District of Kansas. And in

4     that case, which was a Randolph-Sheppard Act case directly in

5     line with what is happening here today, the court held that

6     the -- in order for a plaintiff seeking a preliminary

7     injunction in a Randolph-Sheppard Act case to obtain that

8     injunction, they must show that there's a likelihood of success

9     on the merits at the arbitration.

10         In other words, if -- if -- it's not to get the

11     arbitration or to have the opportunity to participate in

12     arbitration which is guaranteed by the R-S Act anyway; it is to

13     prove that the arbitrators are going to find in your favor, and

14     they need to make a clear showing of that. And that's

15     inconsistent with several cases on point which were also cited

16     in the plaintiff's brief; that's *Colorado Department of Human*

17     *Services v. United States,* that's a 2006 case from the Court of

18     Federal Claims, and *Florida v. United States,* that's a 2018

19     case from the Middle District of Florida.

20         So the plaintiff in this specific case was required to

21     prove that it was likely to win on its arguments at

22     arbitration, that the arbitrators were likely to rule in their

23     favor, not simply that they were going to be able to

24     participate in an arbitration. The only arguments raised as to

25     the actual merits are, first, an untimely argument that the

1  terms of the solicitation did not comply with the R-S Act, and

2  the second, which was summarized as a quote from your order

3  granting the temporary restraining order which was where a term

4  of the PWS is used to exclude a blind vendor from eligibility

5  for a contract to operate a vending facility, it is arguably a

6  limitation requiring written justification and a determination

7  by the Secretary of Education.

8       We respectfully disagree with that position and that

9  analysis.  The provision used in the solicitation here is

10  neutral as to all offerors.  If The Severson Group had produced

11  a proposal that was technically unacceptable, it would have

12  been excluded from the competitive range.  And if Ho`opono had

13  produced a proposal that was not technically unacceptable, then

14  it would have been included in the competitive range and likely

15  would have been awarded the contract.

16       The provision at issue that the R-S Act preference only

17  applies to offerors that fall within the competitive range is

18  actually entirely consistent with the R-S Act which states that

19  the priority applies to the most highly qualified offerors.

20  The R-S Act specifically allows contracting officers to

21  establish a competitive range and specifically contemplates the

22  fact that the R-S-eligible entity may not win that contract if

23  it is excluded from the competitive range.  And that's what

24  happened here.

25       The provision does not specifically target blind vendors.

1    It is completely neutral on its face as to all offerors.

2         It is also important to note that even if it is arguable

3    that the provision creates a limitation, that is not enough at

4    the preliminary injunction stage.  It must -- the plaintiff

5    must prove that it is likely that the arbitration panel will

6    find it to be a limitation at the eventual arbitration, and

7    there has been no effort on the plaintiff's side to do that

8    here.  They have relied mostly on speculation and innuendo and

9    a little bit on conclusory allegations.

10        Contracting officers, indeed, generally have broad

11   discretion in determining how to determine competitive range,

12   and decisions regarding the qualifications for competitive

13   range are only overturned if clearly unreasonable.  If the

14   plaintiff, like I said earlier, had a problem with the way that

15   the agency was going to apply the competitive range or

16   determine which companies would -- which offerors would fall

17   within the competitive range, the time to protest that was

18   before proposals were submitted to give -- to make sure that

19   the proposals match the solicitation, because the evaluation

20   criteria in determining who's going to win a government

21   contract follows the terms of the solicitation to a T.  So if

22   the solicitation itself is incorrect, then all of the offerors

23   need to know it is incorrect and that is why the government

24   requires and common law and a number of courts require a

25   solicitation protest to be filed before proposals are due so

1  that all offerors have the opportunity to know exactly how the

2  agency is going to evaluate them and to follow line by line

3  what the evaluation criteria are going to be.

4       Therefore, plaintiff is not likely to succeed on the

5  merits of its argument before the arbitration panel, at least

6  on the evidence that has been presented today.  And they were

7  required to make a clear showing, which they haven't done.

8       With regard to irreparable harm, we have not conflated

9  revenues and profits.  We have stated in Mr. Severson's

10  declaration that he expected to get $3.5 million in revenues

11  per year from this contract.  That is exactly what he is going

12  to do.

13       Yes, there is a profit margin that was indicated by

14  Mr. Severson's testimony.  Ho`opono and its subcontractor,

15  Blackstone, also have a profit margin.  Because that evidence

16  is not before the Court, we certainly don't want to compromise

17  our proprietary information.

18       But we have, interestingly, no evidence that

19  Ho`opono -- other than Mr. Edwards' argument here -- we

20  actually don't have evidence in the record to suggest that

21  Ho`opono has suffered irreparable harm.  From the beginning of

22  this case, the plaintiff has focused on the blind vendor and

23  the harm directly to the blind vendor, but now he's taking the

24  position that it's Ho`opono, the actual plaintiff, that has

25  suffered the harm.  But there's no evidence in the record of

1    that.  We don't know whether Ho`opono has a profit margin.  I

2    suggest that it likely doesn't because it's an arm of the

3    state.  The blind vendor may certainly have a profit margin and

4    the subcontractor likely has a profit margin, but Ho`opono

5    likely does not.

6        While we don't challenge that blind vendors are certainly

7    worthwhile contract recipients, the integrity of the

8    procurement system must be upheld, and the integrity of this

9    procurement system is that a contracting officer must be

10   permitted to make a decision ultimately that follows the terms

11   of the solicitation because that is a fundamental principle of

12   government contracting law.  And we believe that

13   Ms. Carnaggio's decision in this case was consistent with not

14   only a solicitation, but the R-S Act, because she did find --

15   the evaluation panel did find that there were deficiencies in

16   Ho`opono's proposal that rendered it technically unacceptable.

17       In balancing the harms, essentially at this point if the

18   harm is evaluated by the blind vendor and the harm is compared

19   to The Severson Group, The Severson Group's evidence suggests

20   more of a harm than harm to the blind vendor because as

21   Mr. Stinnett's declaration indicates, he can be moved to

22   another project.  He has -- in fact, he very recently was moved

23   to another project.

24       Prior to working on the Marine Corps Base, he was at a

25   more lucrative contract, so -- where he was, I believe, making

1    $225,000 a year as opposed to the approximately $108,000 a year

2    that he's making here.

3         If Mr. Stinnett has -- and as we noted earlier, the

4    plaintiff has changed the blind vendor after the entry of the

5    temporary restraining order.  So if Mr. Stinnett has suffered

6    any harm at all, it is a harm created entirely of Ho`opono's

7    making because it moved him to this contract to let -- to

8    suffer any harm that would come as opposed to leave him in the

9    position that he was in previously where he was making

10   substantially more money.

11        Mr. Stinnett makes claims in his declaration that if an

12   injunction is not entered, it could put him out of business.

13   But what would put him out of business is Ho`opono moving him

14   to this contract, not the contract -- contracting officer

15   making an appropriate award based on the solicitation and the

16   facts that were available in the parties' proposals.

17        We've also not heard from the plaintiff in this case that

18   the weaknesses and deficiencies that led to a technically

19   unacceptable rating were wrong on their face.  Those are

20   nuanced arguments where the contracting officer and the

21   evaluation panel are entitled to substantial deference.  Those

22   are extremely difficult protest grounds to overturn a proper

23   award to The Severson Group, and we have not seen the plaintiff

24   take -- make the effort to try and convince the Court that

25   those weaknesses and deficiencies were incorrect.

 1     Finally with the public interest, as I mentioned, I don't

 2  think that the Court entering an injunction or denying

 3  injunction -- I think the positions of the parties are in

 4  equipoise.  Certainly there is an importance in maintaining the

 5  integrity of the procurement system.  The Severson Group

 6  submitted a proposal that was technically acceptable and it did

 7  end up in the competitive range, and Ho`opono did not.  And for

 8  The Severson Group to now sit a year after -- more than a year

 9  after that decision was made with no end in sight, the

10  arbitration is still going to go on, but we do not know when

11  that's going to be.  In fact, The Severson Group's attorneys

12  have not even been permitted to intervene in that arbitration

13  to date.

14     This could be years before the Severson Group could ever

15  begin performance, and in order for this decision to be

16  overturned, for the Ho`opono to win this award, they have a

17  very high hurdle to clear.  And to withhold substantial funds

18  from The Severson Group when they had to -- they hired

19  employees and then they had to lay them off because there's no

20  end in sight.

21     The public interest favors denying the injunction to allow

22  Severson Group to perform the contract that they rightfully

23  won.  If Ho`opono is ultimately successful in the arbitration,

24  they will get the position back, if they were eventually found

25  to be in the competitive range.  But in the meantime, the

1   balance of the equities and the public interest best supports

2   The Severson Group being awarded this -- being permitted to

3   perform on this contract that it was awarded and rightfully

4   awarded.

5        So we would ask Your Honor on those grounds that the

6   motion for preliminary injunction be denied.

7        Thank you, Your Honor.

8            THE COURT:  All right.  Thank you very much.

9        All right.  I think you reserved five minutes for

10  rebuttal?

11           MR. EDWARDS:  I always hope not to take as long as I

12  have.

13           THE COURT:  Okay.

14           MR. EDWARDS:  And I'm sure the Court would prefer

15  that as well.

16       A quick tour of my notes here.  First, I'd like to say to

17  Mr. Ching, my apologies.  In the zeal of our advocacy to the

18  extent it was a little mud slinging, that was not our intent

19  because I have nothing but respect for the way you've handled

20  this case all the way through.

21       Regarding the arguments of Mr. Feinberg, as I mentioned

22  before, there's two rails, and contracting officers are well

23  trained in the rails of the FAR.  And when I asked

24  Ms. Carnaggio during her testimony last year if she had any

25  training on the Randolph-Sheppard Act, her answer was really,

1   "No."

2       So that's a problem.  And we've seen cases even where the

3   two rails cross and so basically there's a crash.  And the

4   government, usually the DOD, has to go back and start over.

5       So I think it's important to remember that all procurement

6   decisions, like the *Blue & Gold Fleet* case that

7   Mr. Feinberg mentioned, these decisions are procurement

8   decisions.  They apply to FAR and it's just a different

9   regulatory scheme.

10      In terms of whether or not it's untimely, he said a number

11  of courts have said, you know, that it would be untimely.  They

12  never said that with respect to the Randolph-Sheppard Act, and

13  the only court that has jurisdiction over bid protest in the

14  traditional sense is the Court of Federal Claims.

15      The government Accountability Office also decides those

16  cases.  And true, under a pure procurement perspective the

17  solicitation challenge has to be brought previously, but that's

18  not the case under the Randolph-Sheppard Act.  That's

19  procurement, not Randolph-Sheppard Act, law.

20      When we get to these harms, I mean, I hear what's being

21  said, and Mr. Severson has this right to recover money for not

22  performing, but it's not a new argument that Ho`opono would be

23  irreparably harmed.  We have argued that its beneficiaries, the

24  blind vendors, will be harmed, but Ho`opono as the

25  administrator absolutely harmed.

1          In her testimony Lea Dias was asked (as read):

2          "Is every blind vending opportunity important?"

3          "Absolutely yes."

4          "Why?"

5          "Because the blind vending program provides a way -- it's

6     the most successful program for employment for blind people in

7     the history of the United States.  It maximizes opportunities

8     for blind individuals to become self-sufficient and to become

9     entrepreneurs, to be tax-paying citizens, to live the American

10    dream."

11         "Q.  So is the loss of one opportunity important to you?"

12         "One opportunity is one life now, one blind person's life

13    now, and also an opportunity for people -- blind people in the

14    future."

15         I think that sums it up.  Extraordinary harm for Ho`opono

16    and all the beneficiaries, all of the blind vendors that they

17    serve.

18         That's it.

19              THE COURT:  Okay.  So what about his argument,

20    though, on the likelihood of success on appeal, that we have to

21    look at the court is -- have to look at the likelihood that you

22    win the arbitration?

23              MR. EDWARDS:  Your Honor, we're going to win the

24    arbitration for two reasons.  The first is because in

25    her -- well, within the arbitration, Eileen Carnaggio's

1    decision to exclude the priority SLA from the competitive range

2    was -- well, it was nonsensical.

3        You've got -- as indicated in the evaluation, there were a

4    couple of small things that could have been corrected through

5    discussions, which she only held with TSG, and could have been

6    corrected in a final proposal revision, which she denied to

7    Ho`opono but permitted from TSG, notwithstanding the testimony

8    that competition was the most important part of this process.

9    So she eliminated competition and she didn't permit Ho`opono to

10   complete the process, as she laid it out herself on page 10 of

11   90 in Exhibit 11, which is, "Here's the way I will run my

12   Randolph-Sheppard Act priority."  So she deviated from what she

13   promised to do and so she never should have thrown Ho`opono

14   out.

15           THE COURT:  Right.  So your argument then is that

16   the likelihood of success vis-à-vis the arbitration is even

17   though the procurement officer has extensive discretion which

18   the arbitration -- or the arbitors have to -- arbitration

19   officers have to give great deference to -- that's what the

20   argument is, right, from Mr. Feinberg -- even under such a

21   liberal review of her decisions, hers were based -- had no

22   reasonable basis and, therefore, she abused her discretion.

23           MR. EDWARDS:  I think that's true, but I don't think

24   that's the standard because the Randolph-Sheppard Act doesn't

25   apply the procurement rules as its framework.  It applies the

1    Randolph-Sheppard Act as its framework.  It applies the

2    priority as the framework.  And where is a priority when you

3    throw out the blind vendor for -- you know, blind vendor, a

4    five-year incumbent, who has good working history?  I think

5    absolutely arbitrators will make the decision that that is a

6    violation of the Randolph-Sheppard Act by eliminating the SLA

7    Ho`opono from the competitive range.

8         But the secondary piece of that remains that also the

9    limitations that she used as the basis to eliminate Ho`opono

10   from the competitive range were not justified in writing and

11   were not coordinated with the Secretary Of Education, and those

12   are very important components of 34 C.F.R. 395.90 and -5.90(b).

13   I'm not good at remembering my cites.

14        But I think there's both of those reasons that the

15   arbitrators are going to find that this is a violation and that

16   the arbitrators are going to direct the Marine Corps to take

17   corrective action.

18        So I think there's two reasons and both of them, I think,

19   are more than adequate for arbitrators to make that decision.

20             THE COURT:  All right.  Very good.

21        All right.  So I'm going to consider the matter submitted,

22   subject to you folks filing your closing brief with your

23   supporting -- or reference to or the actual supporting exhibit,

24   if it's not already filed within the court's files on docket.

25        Have you met and conferred and talked about how long you'd

1    like to have for that filing?  Or would you like to talk a

2    little bit more and then advise the court in a letter?

3            MR. EDWARDS:  Your Honor, I thought that we were

4    going to check and see if the court reporter had any --

5            THE COURT:  Oh, yes.

6            MR. EDWARDS:  -- idea.

7            THE COURT:  Okay.  She can do it over the weekend on

8    a rush, but it's going to be at an expedited price.  So she can

9    do that and get that to you before she goes back to the Kealoha

10   trial.

11           (Discussion between the Court and the Law Clerk.)

12           THE COURT:  The suggestion is you just do it on your

13   recollection.  But you want to look at the -- yeah.

14           MR. EDWARDS:  I would prefer to do -- Your Honor,

15   you've asked some very good questions.  I want to make sure

16   that we've addressed those, as well as some of the sites that

17   Mr. Feinberg was mentioning in his argument.  So it doesn't

18   matter to me if it's on an expedited basis.  It would be fine

19   if it's not 'cause, quite honestly, I have a lot of stuff

20   between now and mid July.

21           MS. WADA:  Six weeks is fine.

22           MR. FEINBERG:  I would object to six weeks.  This

23   has already gone on for a very long time and I think that it

24   would be very important to The Severson Group and probably to

25   the Marine Corps to get this resolved quickly.  We would like

1   to file by June 28th.  I understand that's two weeks from

2   today.

3          THE COURT:  Okay.  Well, you can get an expedited

4   transcript by Monday.

5          MR. FEINBERG:  Right.

6          THE COURT:  If you want the transcript, then you

7   have to order it, but you're going to have to pay an expedited

8   basis.

9          MR. FEINBERG:  Right.

10         THE COURT:  Okay.  So June 28th is the deadline, ten

11  pages or less for the argument and then however many exhibits

12  or excerpts or transcripts or whatever you want to refer the

13  court to.  Again, if it's already filed within the docket, if

14  you could just indicate the docket number and what the document

15  is and then I can refer to it.  You don't have to make a copy.

16         If, however, it was received in evidence and wasn't filed

17  after last -- or after the hearing on the temporary restraining

18  order, then please do attach a hard copy.

19         All righty.  Any questions or clarifications?

20         (No response.)

21         All right.  Then I wish all of you a very good Friday and

22  to all of your clients as well.  And safe travels to all of you

23  that need to travel.

24         We are in recess.  Good day, everyone.  Thank you.

25             (Proceedings concluded at 11:29 A.M.)

1                    COURT REPORTER'S CERTIFICATE

2

3              I, DEBRA READ, Official Court Reporter, United

4    States District Court, District of Hawaii, do hereby certify

5    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

6    true, and correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the regulations

9    of the Judicial Conference of the United States.

10
               DATED at Honolulu, Hawaii, June 14, 2019.
11

12

13                    */s/ Debra Read*

14                    DEBRA READ, CSR CRR RMR RDR

15

16

17

18

19

20

21

22

23

24

25