UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| STATE OF HAWAII, DEPARTMENT OF HUMAN SERVICES, DIVISION OF VOCATIONAL REHABILITATION, HOOPONO-SERVICES FOR THE BLIND, | CIV. NO. 18-00128 LEK |
| Plaintiff, | |
| vs. | |
| UNITED STATES MARINE CORPS, BY AND THROUGH GENERAL ROBERT B. NELLER, INCUMBENT COMMANDANT OF THE MARINE CORPS, IN HIS OFFICIAL CAPACITY; | |
| Defendant. | |

**ORDER GRANTING PLAINTIFF'S AMENDED
MOTION FOR PRELIMINARY INJUNCTION**

On March 8, 2019, Plaintiff State of Hawaiʻi,

Department of Human Services, Division of Vocational

Rehabilitation, Hoʻopono - Services for the Blind ("Hoʻopono"),

filed its "Supplemental Memorandum in Support of Its Motion for

Declaratory and Injunctive Relief," which is construed as its

amended motion for a preliminary injunction ("Amended Motion").[1]

[Dkt. no. 61.]  On April 12, 2019, Intervenor the Severson

Group, LLC ("TSG") and Defendant United States Marine Corps, by

---

[1] Hoʻopono filed its original Motion for Declaratory and
Injunctive Relief on April 3, 2018 ("4/3/18 Motion").  [Dkt.
nos. 2 (4/13/18 Motion), 3 (mem. in supp. of 4/3/18 Motion).]

and through General Robert B. Neller, Incumbent Commandant of the Marine Corps, in his official capacity ("Marine Corps"), filed their respective memoranda in opposition to the Amended Motion. [Dkt. nos. 62 ("TSG Opp."), 63.] On May 10, 2019, Ho`opono filed its reply memoranda. [Dkt. nos. 76, 77.] The Marine Corps' April 12, 2019 memorandum in opposition was withdrawn and replaced by an amended memorandum, filed on May 29, 2019. [Dkt. nos. 85 (notice of withdrawal), 86 ("Marine Corps Opp.").]

The Amended Motion came on for an evidentiary hearing on June 14, 2019. [Minutes, filed 6/14/19 (dkt. no. 91).] The parties filed their closing briefs on June 28, 2019. [Dkt. nos. 96 (Marine Corps' brief), 97 (TSG's brief), 98 (Hoopono's brief).] On July 16, 2019, this Court issued an entering order informing the parties of its ruling on the Amended Motion. [Dkt. no. 99.] The instant Order supersedes that entering order. Hoopono's Amended Motion is hereby granted, and a preliminary injunction is hereby entered, pending the resolution of the arbitration between the Marine Corps and Ho`opono.

## BACKGROUND

The relevant background is set forth in this Court's May 11, 2018 Order Granting Plaintiff's Motion for Temporary

2

Restraining Order ("TRO Order").  [Dkt. no. 32.[2]]  It will only

be briefly restated here.

Ho`opono is the state licensing agency ("SLA") for

purposes of the Randolph-Sheppard Vending Stand Act ("RSA"), 20

U.S.C. § 107, *et seq.*, in Hawai`i.  TRO Order, 2018 WL 2187977,

at *1.  Hoopono's licensed blind vendor and teaming partner

Blackstone Consulting, Inc. ("BCI" and collectively "Ho`opono

Contractor") operated the food service facilities at the Marine

Corps Base Hawai`i ("MCBH") pursuant to a five-year contract

that commenced on March 1, 2013 and was worth approximately

$14 million.[3]  Id. at *1-2.  The contract ran through the end of

February 2018, but the Marine Corps exercised the extension

clause to extend the contract through May 15, 2018.  Id. at *2.

Hoopono's "services . . . consistently received satisfactory

ratings, with one excellent rating."  Id. at *1.

The instant case arises from a dispute concerning

Hoopono's bid for the subsequent contract period.  On

September 25, 2017, the Marine Corps issued Solicitation

number M003-18-17-R-0003 for a new MCBH food services contract,

---

[2] The TRO Order is also available at 2018 WL 2187977.  The
TRO Order addressed Hoopono's Motion for Temporary Restraining
Order ("TRO Motion"), filed on April 17, 2018.  [Dkt. nos. 12
(TRO Motion) & 13 (mem. supp. of TRO Motion).]

[3] At the time of the TRO Order, Hoopono's licensed blind
vendor was Stanley Young.  2018 WL 2187977, at *1.

with a base term of one year and four option years

("Solicitation"). On October 24, 2017, the Marine Corps issued

an amendment to the Solicitation, adding certain minimum

staffing requirements ("Amendment 1"). Two further amendments

were issued thereafter, but they are not relevant to the instant

case. Id. at *2-3.

Ho`opono submitted its response to the Solicitation

("Ho`opono Proposal") on November 17, 2017, but it was rated as

unacceptable as to its food services operations plan and its

staffing and transition plan. Thus, the Ho`opono Proposal was

given an overall technical rating of unacceptable, meaning that

Hoopono's past performance and the price in the Ho`opono

Proposal were not considered, and the RSA priority was not

applied. The Ho`opono Proposal was excluded from the

competitive range, and the contract was ultimately awarded to

TSG, a private vendor that submitted the only proposal found to

be in the competitive range ("TSG Proposal"). Id. at *3 & n.10.

The amount of the contract awarded to TSG was $18,419,014.74.

Id. at *4. TSG's contract was scheduled to begin on April 15,

2018. Following a thirty-day overlap with Ho`opono for

transition purposes, TSG was scheduled to begin sole operation

of the MCBH food service facilities as of May 16, 2018. Id.

However, the TRO Order requires the Marine Corps to maintain

Ho`opono as the MCBH food services vendor, and it prohibits the

4

Marine Corps from putting its contract with TSG into effect, until this Court rules on the issue of whether Ho`opono is entitled to a preliminary injunction. Id. at *9.

On June 28, 2018, TSG filed a motion to intervene. [Dkt. no. 38.] The motion was orally granted on August 10, 2018, and in an order filed on August 22, 2018. [Dkt. nos. 50 (minutes of hearing on the motion to intervene), 53 (order).]

## I.    Stipulated Facts

### A.    Food Service Operations

After this Court issued the TRO Order, the Marine Corps suspended TSG's performance of the new contract by issuing a Stop Work Order. Any contractor who receives a Stop Work Order can request an equitable adjustment, or it can make a claim under the Contract Disputes Act ("CDA"). The contractor can pursue administrative or judicial remedies if it is dissatisfied with the Marine Corps' final decision on the CDA claim. [Amended Stipulation Re: Pltf.'s Suppl. Motion for Declaratory and Injunctive Relief ("Stipulated Facts"), filed 6/27/19 (dkt. no. 95), at ¶ 3.[4]]

---

[4] Although the Stipulated Facts are not signed by this Court, [Stipulated Facts at pg. 6,] the original stipulation was, [Stipulation Re: Pltf.'s Suppl. Motion for Declaratory and Injunctive Relief, filed 5/23/19 (dkt. no. 84)]. At the hearing on the Amended Motion, Hoopono's counsel noted that some language had been inadvertently omitted from the original stipulation. The omitted language was read into the record and
(. . . continued)

In August 2018, the Marine Corps and Ho`opono entered
into a sole-source, one-year, bridge contract worth
$3,991,901.20. Under the bridge contract, the Ho`opono blind
vendor receives a share of the net profits, but is also
responsible for a share of any net losses. [Id. at ¶ 5.] The
net profits "average up to $9,000 a month." [Id.]

Since June 2018, *i.e.*, since the TRO Order has been in
effect, the Marine Corps has issued ten Contractor Discrepancy
Reports ("CDRs") and completed two Contractor Performance
Assessment Reports ("CPARs") to address concerns regarding the
Ho`opono Contractor's "level of staffing, staff turnover, food
safety, cleanliness, property accountability, and completion of
contractor employee background checks." [Id. at ¶ 2.] The
Ho`opono Contractor responded to each CDR in a timely manner.
[Id.] Some of the concerns were "rebutted or refuted . . . to
the satisfaction of the contracting officer," but, in other
instances, the compensation to the Ho`opono Contractor was
decreased as a result of the CDR. [Id.] There have been no
written notices of performance concerns since April 1, 2019.
[Id.]

---

confirmed by opposing counsel. This Court instructed Ho`opono
to file an amended stipulation. [Trans. of 6/14/19 hrg. on
Amended Motion ("6/14/19 Trans."), filed 6/17/19 (dkt. no. 92),
at 6-7.]

## B.   <u>Arbitration Proceedings</u>

On June 29, 2018, the Marine Corps submitted a letter to the United States Department of Education ("US DOE"), designating the Marine Corps' arbitration panel member, but the US DOE has not directed Ho`opono to identify its panel member. Ho`opono is waiting for further direction from the US DOE.  [<u>Id.</u> at ¶ 6.]  Ho`opono "has not failed to timely respond to any request from the [US DOE] related to this dispute."  [<u>Id.</u> at ¶ 11.]

TSG submitted requests to intervene in the arbitration on July 5, 2018 and September 13, 2018, but no action has been taken on those requests.  [<u>Id.</u> at ¶ 7.]

On April 29, 2019, the Marine Corps made a formal request to the US DOE that the arbitration panel be convened, and Ho`opono joined in that request on May 20, 2019.  However, as of the date of the hearing on the Amended Motion, the Secretary of the US DOE had not convened the arbitration panel. [<u>Id.</u> at ¶¶ 8-10.]

## II.  <u>Evidence Submitted for the Amended Motion</u>

Virgil Stinnett replaced Mr. Young as Hoopono's licensed blind vendor at MCBH, as of November 1, 2018.  [Amended Motion, Decl. of Virgil Stinnett ("Stinnett Decl.") at ¶ 3.]  As Hoopono's licensed blind vendor at MCBH, Mr. Stinnett receives approximately $9,000 per month.  [<u>Id.</u> at ¶ 14.]  If the Ho`opono

Contractor is displaced at MCBH during the pending arbitration,
Mr. Stinnett "may never be able to recover from this financial
set back," even if Ho`opono ultimately prevails in the
arbitration and is reinstated at MCBH.  [<u>Id.</u> at ¶ 19.]

TSG "is a service-disabled veteran-owned small
business, and a participant in the U.S. Small Business
Administration's [("SBA")] 8(a) Program."[5]  [TSG Opp., Decl. of

---

[5] The United States Supreme Court has stated that the SBA
8(a) Program:

> is available to small businesses controlled by
> socially and economically disadvantaged
> individuals as the SBA has defined those terms.
> The 8(a) program confers a wide range of benefits
> on participating businesses, <u>see, e.g.</u>, 13 CFR
> §§ 124.303–124.311, 124.403 (1994); 48 CFR
> subpt. 19.8 (1994), one of which is automatic
> eligibility for subcontractor compensation
> provisions . . . , 15 U.S.C. § 637(d)(3)(C)
> (conferring presumptive eligibility on anyone
> "found to be disadvantaged . . . pursuant to
> section 8(a) of the Small Business Act").  To
> participate in the 8(a) program, a business must
> be "small," as defined in 13 CFR § 124.102
> (1994); and it must be 51% owned by individuals
> who qualify as "socially and economically
> disadvantaged," [13 C.F.R.] § 124.103.  The SBA
> presumes that black, Hispanic, Asian Pacific,
> Subcontinent Asian, and Native Americans, as well
> as "members of other groups designated from time
> to time by SBA," are "socially disadvantaged,"
> [13 C.F.R.] § 124.105(b)(1).  It also allows any
> individual not a member of a listed group to
> prove social disadvantage "on the basis of clear
> and convincing evidence," as described in
> § 124.105(c).  Social disadvantage is not enough
> to establish eligibility, however; SBA also
> requires each 8(a) program participant to prove
>
> (. . . continued)

Robert Severson ("Severson Decl.") at ¶ 3.[6]]  Mr. Severson states
that, during the transition period with Ho`opono, TSG "incurred
project-specific costs of approximately $20,000" for items such
as "equipment, uniforms, travel costs, hiring costs, shipping,
supplies, administrative, and management payroll costs"
("Start-up Costs").[7]  [Id. at ¶¶ 6-7.]  The Start-up Costs do not
include TSG's "overall overhead costs."  [Id. at ¶ 7.]  TSG
expected to receive $3.5 million in annual revenue under the
MCBH contract.  [Id. at ¶ 9.]  Mr. Severson emphasizes that,
because TSG's MCBH contract had a base-year and four option
years, TSG "has already lost the opportunity to perform the base
year," and it is "at risk of the entire period of performance
running out before the [arbitration] is resolved."  [Id. at
¶ 10.]

<hr>

"economic disadvantage" according to the criteria
set forth in [13 C.F.R.] § 124.106(a).

Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 207 (1995)
(some alterations in Adarand).

[6] Robert Severson is the TSG President and Chief Executive
Officer.  [Severson Decl. at ¶ 2.]  Mr. Severson previously
served as a Marine for twenty-seven years.  [Id. at ¶ 16.]

[7] Mr. Severson later submitted testimony that the precise
amount of the Start-up Costs was $22,221.83.  [Decl. of Robert
Severson, filed 5/17/19 (dkt. no. 83) ("Suppl. Severson Decl."),
at ¶ 10.]

(. . . continued)

Mr. Severson acknowledges that, if TSG's MCBH contract is ultimately terminated, TSG "may be able to submit a termination settlement proposal or request for equitable adjustment." [Id. at ¶ 11.a.]  However, he argues TSG is being irreparably harmed by the TRO Order because TSG has no means to obtain **immediate** recovery of the Start-up Costs and the costs that it incurred because of the Stop Work Order.[8]  [Id.] Further, he asserts "it is unlikely" that TSG will recover all of its Start-up Costs and other costs, such as the costs to prepare the TSG Proposal, even if it submits a termination settlement proposal or a request for equitable adjustment.  [Id. at ¶ 11.b.]  TSG has also incurred legal fees and other costs in this action, as well as in other proceedings in which TSG has attempted to protect its interest in the MCBH contract.  [Suppl. Severson Decl. at ¶ 17.]

In addition, Mr. Severson asserts the TRO Order is causing TSG non-monetary harm, including: depriving TSG of "the opportunity to build upon its strong past performance record by adding a contract with substantial size and scope"; [Severson Decl. at ¶ 13;] and "increase[ing] the risk that TSG will lose

---

[8] Mr. Severson states the Marine Corps "has advised TSG that it will not consider a request for equitable adjustment under the stop work order until the stop work order is resolved." [Suppl. Severson Decl. at ¶ 16.c.]

(. . . continued)

valuable personnel,"[9] [id. at ¶ 14].  He speculates that, if TSG were performing the MCBH contract, TSG "would be able to leverage it to win more contracts in the future."  [Id.]

## DISCUSSION

## I.  Jurisdiction

At the outset, the Marine Corps argues this Court lacks jurisdiction to issue an injunction in this case because Ho`opono has not, and cannot, present an independent claim for judicial relief at this time.  RSA arbitration decisions are subject to judicial appeal and review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06, as final agency actions.  See Sauer v. U.S. Dep't of Educ., 668 F.3d 644, 647 (9th Cir. 2012) (citing 20 U.S.C. § 107d-2(a)).  The Marine Corps argues this matter will not be ripe for judicial review until the US DOE arbitration panel issues a final decision.

A district court in the Eastern District of Virginia has addressed the same issue, and its analysis is persuasive. The district court stated:

> the suit for injunctive relief is based on Plaintiffs' independent legal right to arbitrate the Government's alleged failure to comply with the Randolph Sheppard Act. . . .  [T]he RSA, provides that:

---

[9] Mr. Severson later stated that the loss of revenue caused by the TRO Order "left [TSG] with no option but to lay off personnel."  [Suppl. Severson Decl. at ¶ 14.]

11

Whenever any State licensing agency
determines that any department, agency, or
instrumentality of the United States that
has control of the maintenance, operation,
and protection of Federal property is
failing to comply with the provisions of
this chapter or any regulations issued
thereunder (including a limitation on the
placement or operation of a vending facility
as described in section 107(b) of this title
and the Secretary's determination thereon)
such licensing agency may file a complaint
with the Secretary **who shall convene a panel
to arbitrate the dispute** pursuant to section
107d-2 of this title, and the decision of
such panel shall be final and binding on the
parties except as otherwise provided in this
chapter.

20 U.S.C. § 107d-1 (emphasis added).  Once the
Secretary receives any such complaint, the
Secretary "shall convene an ad hoc arbitration
panel . . . give notice, conduct a hearing, and
render its decision which shall be subject to
appeal and review as a final agency action for
purposes of [the APA]" 20 U.S.C. § 107d-2.  If
the panel finds that an act or practice of an
agency or department violates the RSA, then the
head of that department is instructed to
terminate the act or practice and take "such
other action as may be necessary to carry out the
decision of the panel."  Id.

Plaintiffs have filed a complaint for
arbitration with the Department of Education
alleging that the Government's decision to
exclude Plaintiffs from the competitive range
violated the RSA.  Plaintiffs are presently
performing the contract at Fort Benning.  If
Plaintiffs had been included in the competitive
range, under the RSA Plaintiffs would have
received priority to perform the contract at Fort
Benning, subject only to limited exceptions.  The
RSA gives this Court authority to review the
arbitration panel's decision as a final agency
action under the Administrative Procedure Act.
20 U.S.C. § 107d-2.  Therefore, the Court FINDS

that it has jurisdiction to grant injunctive
relief to maintain the status quo of Plaintiffs
and Defendant's contractual relationship while
their arbitration is pending pursuant to Federal
Rule of Civil Procedure 65.

Ga. Vocational Rehab. Agency Bus. Enter. Program v. United
States, Civil Action No. 4:18cv148, 2019 WL 279992, at *4 (E.D.
Va. Jan. 22, 2019) (emphasis and some alterations in Ga.
Vocational).  For the same reasons as those set forth in Georgia
Vocational, this Court concludes that it has jurisdiction over
Hoopono's request in the Amended Motion.

## II.  **Preliminary Injunction**

The standards applicable to Hoopono's request for a
preliminary injunction are the same as those applied to
Hoopono's request for a TRO.  See Washington v. Trump, 847 F.3d
1151, 1159 n.3 (9th Cir. 2017) (noting "the legal standards
applicable to TROs and preliminary injunctions are substantially
identical" (citation and internal quotation marks omitted)).
Thus, the applicable standards are set forth in the TRO Order,
2018 WL 2187977, at *5, and will not be repeated here.  Further,
because the same standards apply, the evidence presented in
connection with the TRO Motion will be considered in ruling on
the Amended Motion.  See also Stipulated Facts at ¶ 4 ("The
parties further stipulate that all of the documents and evidence
presented at the hearing granting the TRO in this case, are all

also stipulated into evidence and to be considered for the hearing on the [preliminary injunction].").

### A. __Likelihood of Success__

Ultimately, the issue of whether the Marine Corps violated the RSA in awarding the MCBH contract to TSG is for the US DOE arbitration panel to decide.  <u>See</u> 20 U.S.C. §§ 107d-1(b), 107d-2(a), 107d-2(b)(2).  However, in reviewing the Amended Motion, this Court must determine whether Ho`opono is likely to succeed on the merits in the arbitration.  <u>See, e.g.</u>, <u>Kansas v. United States</u>, 171 F. Supp. 3d 1145, 1158 (D. Kan. 2016), *aff'd in part sub nom.*, <u>Kansas ex rel. Kan. Dep't for Children & Families v. SourceAmerica</u>, 874 F.3d 1226 (10th Cir. 2017).[10]

As noted in the TRO Order, the Ho`opono Proposal was not included in the competitive range because it received unacceptable ratings for its food services operations plan and staffing and transition plan.  2018 WL 2187977, at *3. Hoopono's position is that the Ho`opono Proposal should have been included in the competitive range because the proposal included the staffing levels that the Ho`opono Contractor had

_____

[10] Because the SLA had prevailed in the RSA arbitration by the time the appeal was decided, the Tenth Circuit declined to address the issue of whether the district court erred in granting the SLA a preliminary injunction during the pendency of the arbitration.  <u>Kansas</u>, 874 F.3d at 1236 n.3.

been providing under the original contract, including its option

periods, plus the increases required by Amendment 1.  See id.

>The RSA's implementing regulations provide:
>
>(a)  Each department, agency, or instrumentality of the United States in control of the maintenance, operation, and protection of Federal property shall take all steps necessary to assure that, wherever feasible, in light of appropriate space and potential patronage, one or more vending facilities for operation by blind licensees shall be located on all Federal property **Provided** that the location or operation of such facility or facilities would not adversely affect the interests of the United States.  Blind persons licensed by State licensing agencies shall be given priority in the operation of vending facilities on any Federal property.
>
>(b)  Any limitation on the location or operation of a vending facility for blind vendors by a department, agency or instrumentality of the United States based on a finding that such location or operation or type of location or operation would adversely affect the interests of the United States shall be fully justified in writing to the Secretary who shall determine whether such limitation is warranted.  A determination made by the Secretary concerning such limitation shall be binding on any department, agency, or instrumentality of the United States affected by such determination. The Secretary shall publish such determination in the Federal Register along with supporting documents directly relating to the determination.

34 C.F.R. § 395.30(a)-(b) (emphasis in original).  At the

hearing on the TRO Motion, Eileen Keating Carnaggio[11] testified

---

[11] Ms. Carnaggio, a civilian employee of the Marine Corps, was the contracting officer who handled Solicitation and the

(. . . continued)

that she was not aware of any written findings that the terms in the Solicitation's Performance Work Statement ("PWS") were necessary to avoid an adverse effect on the United States' interests. [Trans. of 5/9/18 hrg. on TRO Motion ("5/9/18 Trans."), 5/17/18 (dkt. no. 35), at 31-32.] In fact, it appeared that Ms. Carnaggio was not aware of the requirements of § 395.30(a) and (b). During her cross-examination by Hoopono's counsel, Ms. Carnaggio testified:

> Q     Did you make a written finding that the PWS and its limits were necessary so that the interests of the United States would not be adversely affected?
>
> A     I'm not aware of a document like that. It's like a DNF?[12]
>
> . . . .
>
> Q     And you did not send anything to the Secretary of Education indicating that the limits in the PWS were necessary in order to not adversely affect the interests of the United States, correct?
>
> A     I – I – I'm really kind of confused by the question.  I don't really understand it.
>
> . . . .

evaluation and award of the contract referenced therein. [Marine Corps' Exhibit List, filed 4/25/18 (dkt. no. 17), Exh. O (Decl. of Eileen Keating Carnaggio ("Carnaggio Decl.")) at ¶¶ 1, 3.]

[12] This appears to refer to a Determination and Findings, also referred to as a "D&F." <u>See</u> Federal Acquisition Regulation ("FAR"), 48 C.F.R. § 1.701.

THE WITNESS: We wrote that PWS in the manner to improve the services on the Marine Corps Base, to improve the mess hall services. We weren't trying to make it difficult for anybody to propose or we weren't trying to make any kind of limitations of anybody. We were just trying to write it in a way that we could provide good services to the Marines. So **I just don't really understand this limitation thing that you're referring to.** I don't - I don't understand it. Sorry.

[5/9/18 Trans. at 31-33 (emphasis added).] Based on Ms. Carnaggio's testimony, it is clear that, if § 395.30(a) and (b) applied to the PWS in the Solicitation, as amended, the Marine Corps failed to comply with the requirements in those sections. The Marine Corps' position is that the PWS in the Solicitation, as amended, only contained the terms that were necessary to achieve the desired quality of dining services at MCBH. In the Marine Corps' view, those terms were not limitations, and therefore it was not required to consult the US DOE Secretary to determine whether a limitation was warranted to avoid an adverse effect on the United States' interests.

However, the evidence presented in connection with the TRO Motion shows that the "terms" of the PWS in the Solicitation, as amended, effectively excluded Ho`opono from eligibility for the MCBH contract. See, e.g., 5/9/18 Trans. at 28-29 (Ms. Carnaggio's testimony about the staffing requirements in the PWS); Mem. in supp. of 4/3/18 Motion, Exh. 9-1 (Amendment 1) at 17, § 2.6.1 (Staffing Requirements). Thus, in

the US DOE arbitration, Ho`opono is likely to succeed on the merits of the following issues: 1) the terms of the PWS were limitations that required a written justification to the US DOE Secretary, and a determination by the secretary that the limitations were warranted; 2) the Marine Corps failed to comply with those requirements; and 3) the bidding process for the Solicitation therefore violated the RSA.[13]  The first requirement for a preliminary injunction – likelihood of success on the merits – is satisfied.  See Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008) (listing requirements).

**B.  Irreparable Harm**

In the TRO Order, it was determined that,

> even if Ho`opono prevails in the arbitration, the Marine Corps' sovereign immunity would preclude Ho`opono from recovering any monetary damages from the Marine Corps.  Because of the inability to recover monetary losses incurred while the arbitration is pending, the imminent economic injury Ho`opono and Mr. Young face would be irreparable.  Thus, the irreparable harm factor weighs in favor of granting the TRO.

2018 WL 2187977, at *8.  There have been no changes in the material circumstances of this case since the entry of the TRO

---

[13] Ho`opono contests other aspects of the bidding and award process for the Solicitation.  However, for purposes of the Amended Motion, it is sufficient that Ho`opono is likely to succeed on the merits of the issue of § 395.30(b) compliance. It is not necessary to address whether Ho`opono is likely to succeed on the merits of all of the issues in the arbitration.

Order.  Hoopono's replacement of Mr. Young with Mr. Stinnett as

its licensed blind vendor for the MCBH food services operations

does not change the irreparable harm analysis.  It is the State

of Hawai`i Department of Human Services, through Ho`opono, that

enters into contracts with the Marine Corps, not the individual

blind vendors.  See, e.g., Carnaggio Decl. at ¶ 4 ("The

incumbent contractor is the State of Hawaii's Department of

Human Services, Ho`opono Services for the Blind Branch.").

There has been no evidence that Ho`opono violated the current

MCBH bridge contract by replacing Mr. Young with Mr. Stinnett,

another licensed blind vendor.  This Court therefore rejects

TSG's argument that Ho`opono has failed to maintain the status

quo that was preserved in the TRO Order.

        The evidence presented in connection with the TRO

Motion establishes that both Ho`opono and the licensed blind

vendor assigned to MCBH would face irreparable harm unless the

status quo is maintained.  For example, Lea Dias[14] testified that

the loss of the MCBH contract "would be a huge loss of

opportunity for the blind vending program" because "[i]t would

be a loss of income for" the blind vendor "[a]nd it would be a

_____

        [14] Ms. Dias is Hoopono's Branch Administrator, and has been
in that position since 2009.  [Mem. in supp. of 4/3/18 Motion,
Exh. 2 (Decl. of Lea Dias ("Dias Decl.")) at ¶¶ 2, 6.]  She was
Hoopono's contact person for its original MCBH contract.  [Id.
at ¶ 27.]

lost opportunity and minimizing the intent of the Randolph-Sheppard Act." [5/9/18 Trans. at 45-46.] Ms. Dias testified that every blind vending contract is important to Ho`opono because the federal blind vending program is "the most successful program for employment for blind people in the history of the United States. It maximizes opportunities for blind individuals to become self-sufficient and to become entrepreneurs, to be tax-paying citizens, to live the American dream." [Id. at 48.]

Mr. Stinnett receives substantial income from the MCBH contract,[15] and the loss of that income would cause him irreparable harm because the Marine Corps' sovereign immunity would preclude him from recovering money damages from the Marine Corps if Ho`opono prevails in the arbitration. See Stinnett Decl. at ¶¶ 14, 19; TRO Order, 2018 WL 2187977, at *7 (discussing sovereign immunity (some citations omitted) (citing Sauer v. U.S. Dep't of Educ., 668 F.3d 644, 647 (9th Cir. 2012); 5 U.S.C. § 702; Premo v. Martin, 119 F.3d 764, 771 (9th Cir.

---

[15] Mr. Stinnett's income from the blind vending facility that he was assigned to prior to MCBH was greater than his anticipated income from the MCBH operation. See Stinnett Decl. at ¶¶ 13-14. However, that fact is irrelevant to the irreparable harm analysis because his anticipated income from the MCBH operation is significant, and there has been no evidence suggesting that the transfer of Mr. Stinnett to Hoopono's MCBH operation was improper.

1997))).  Thus, Ho`opono and Mr. Stinnett are likely to suffer

irreparable harm in the absence of a preliminary injunction.

The second Winter requirement also weighs in favor of granting

the Amended Motion.

### C. **Balancing of the Equities**

The third Winter requirement – that the equities weigh

in the plaintiff's favor – involves weighing the possible harm

that would be caused by a preliminary injunction against the

possible harm that would be caused by not issuing a preliminary

injunction.  See TRO Order, 2018 WL 2187977, at *8 (quoting

Univ. of Hawai`i Prof'l Assembly v. Cayetano, 183 F.3d 1096,

1108 (9th Cir. 1999)).

In granting the TRO Motion, it was found that any

injury the Marine Corps would suffer if a TRO was granted was

outweighed by the injury that Ho`opono and its blind vendor

would suffer if a TRO was not issued.  Id. at *9.  The Marine

Corps has not presented any evidence in connection with the

Amended Motion that would alter this analysis.  Although there

is evidence of some concerns with the Ho`opono Contractor's

performance at MCBH since the issuance of the TRO Order, all of

those concerns have been resolved, and there have been no

concerns raised since April 1, 2019.  [Stipulated Facts at ¶ 2.]

Further, there has been no evidence suggesting that the concerns

which were raised prior to April 1, 2019 were of such a serious

21

nature that they should alter this Court's balancing of the
equities in this matter. Therefore any injury the Marine Corps
would suffer if a preliminary injunction is granted is
outweighed by the injury that Ho`opono and its blind vendor
would suffer if a preliminary injunction is not issued.

In the TRO Order, the possible harm that a TRO would
cause TSG was considered, and the possible harm to TSG was found
to be primarily economic and outweighed by the possible harm to
Ho`opono if a TRO was not entered. See 2018 WL 2187977, at *8-
9. However, at that time, "[t]here [wa]s no evidence about the
severity of [TSG]'s economic injury if a TRO [wa]s granted."
Id. at *9. Evidence about the possible economic and non-
economic harm to TSG is now before this Court.

The losses TSG has incurred because of the TRO Order
and the Stop Work Order are regrettable and, without a doubt,
painful to TSG. However, TSG has remedies at law, which are
mandated by the FARs.

> (a) The Contracting Officer may, at any time, by
> written order to the Contractor, require the
> Contractor to stop all, or any part, of the work
> called for by this contract for a period of
> 90 days after the order is delivered to the
> Contractor, and for any further period to which
> the parties may agree. The order shall be
> specifically identified as a stop-work order
> issued under this clause. Upon receipt of the
> order, the Contractor shall immediately comply
> with its terms and take all reasonable steps to
> minimize the incurrence of costs allocable to the
> work covered by the order during the period of

work stoppage.  Within a period of 90 days after a stop-work order is delivered to the Contractor, or within any extension of that period to which the parties shall have agreed, the Contracting Officer shall either—

(1)  Cancel the stop-work order; or

(2)  Terminate the work covered by the order as provided in the Default, or the Termination for Convenience of the Government, clause of this contract.

(b)  If a stop-work order issued under this clause is canceled or the period of the order or any extension thereof expires, the Contractor shall resume work.  **The Contracting Officer shall make an equitable adjustment in the delivery schedule or contract price, or both, and the contract shall be modified, in writing**, accordingly, if—

(1) The stop-work order results in an increase in the time required for, or in the Contractor's cost properly allocable to, the performance of any part of this contract; and

(2) The Contractor asserts its right to the adjustment within 30 days after the end of the period of work stoppage; provided, that, if the Contracting Officer decides the facts justify the action, the Contracting Officer may receive and act upon a proposal submitted at any time before final payment under this contract.

(c)  If a stop-work order is not canceled and the work covered by the order is terminated for the convenience of the Government, **the Contracting Officer shall allow reasonable costs resulting from the stop-work order in arriving at the termination settlement**.

(d)  If a stop-work order is not canceled and the work covered by the order is terminated for default, **the Contracting Officer shall allow, by**

**equitable adjustment or otherwise, reasonable
costs resulting from the stop-work order**.

48 C.F.R. § 52.242-15 (emphases added).  Mr. Severson emphasizes

that neither an equitable adjustment nor a termination

settlement is immediately available, and he asserts that neither

will compensate TSG for all of the costs TSG has incurred.  Even

accepting these representations, the monetary harm that TSG

would suffer if a preliminary injunction is entered is

outweighed by the monetary harm that Ho`opono and its blind

vendor would suffer if a preliminary injunction is not entered.

Hoopono's potential monetary harm is more severe because, even

if Ho`opono prevails in the US DOE arbitration, Ho`opono has no

remedy at law if it is displaced from the MCBH food services

operation while the arbitration is pending.

TSG also asserts it is suffering non-monetary impacts

because of the TRO Order, and it will continue to suffer such

impacts if a preliminary injunction is entered.  As to TSG's

position that it is being deprived of the opportunity to build

its performance record, Mr. Severson himself admits TSG already

has a "robust past performance record."  [Severson Decl. at

¶ 13.]  "TSG has performed four contracts for dining services

within the last five years, with an average contract value of

$1.9 million per year."  [Suppl. Severson Decl. at ¶ 22.]

Further, since it was initially awarded the MCBH contract, TSG

submitted six other contract proposals.  [Id. at ¶ 23.]  Thus,
TSG's inability to build its performance record by operating the
MCBH food service facilities cannot be found to be a substantial
harm.  Mr. Severson also testified that, if TSG were performing
the MCBH contract, TSG would be able to use that experience to
obtain more high-value contracts.  [Id. at ¶ 22.]  No evidence
has been submitted to support this position, nor has evidence
been submitted that its non-performance of the MCBH contract
precluded it from obtaining any other contract.  Finally, TSG's
loss of personnel is regrettable, but that loss is comparable to
the loss of personnel that the Ho`opono Contractor would
experience if a preliminary injunction is not entered.  Thus,
the non-monetary harm that TSG would suffer if a preliminary
injunction is entered does not outweigh the non-monetary harm
that Ho`opono and the Ho`opono Contractor would suffer if
preliminary injunction is not entered.

        Having considered all of the potential harms that are
likely to result if a preliminary injunction is entered and all
of the potential harms that are likely to result if one is not
entered, it is clear that the third Winter requirement weighs in
favor of entering a preliminary injunction.

    D.    **Public Interest**

        The analysis of the fourth Winter requirement – that
the public interest weigh in the plaintiff's favor – set forth

in the TRO Order also applies to Hoopono's request for a
preliminary injunction.  See 2018 WL 2187977, at *9.  However,
the record now includes evidence regarding the public's interest
in seeing the MCBH Contract awarded to TSG, a participant in the
SBA 8(a) Program.  The purposes of the SBA 8(a) Program are
laudable, and the public has an interest in seeing government
contracts awarded to qualifying small businesses.  However, the
Solicitation states:

> The Randolph Sheppard Act vendor (a State
> Licensing Agency) will be afforded priority for
> award of the contract.  Therefore, if a State
> Licensing Agency submits a proposal that is among
> the most highly rated proposals with a fair and
> reasonable price and if it is judged to have a
> reasonable chance of being selected for award as
> determined by the contracting officer after
> applying the evaluation criteria contained in the
> solicitation and completeing [sic] any required
> consultation with the U.S. Department of
> Education, the State Licensing Agency will
> receive the contract award.

[Mem. in supp. of 4/3/18 Motion, Exh. 9 (Solicitation) at 101 of
103, ¶ 2 (citations omitted).]  Thus, by its own terms, the
Solicitation placed the RSA priority above the SBA 8(a) Program
set-aside.  Hoopono's position in this case is that the Marine
Corps violated the RSA at multiple stages of the solicitation
and award process and, had the Marine Corps complied with the
RSA, the MCBH contract would have been awarded to Ho`opono, not
to the SBA 8(a) Program participant.  It is because Congress has
expressly stated that the RSA vendor will have priority – and

26

not because TSG is unworthy of being awarded the MCBH contract –
that is the basis for granting the preliminary injunction.

Issuing a preliminary injunction would further the
RSA's purposes by preserving the status quo until the
arbitration panel determines whether the Marine Corps violated
the RSA.  Preserving the status quo is appropriate because
Ho`opono has established that it is likely to succeed on the
merits of at least one of the issues in the arbitration.  The
fourth <u>Winter</u> requirement therefore weighs in favor of granting
the Amended Motion.

     **E.**    **<u>Summary</u>**

Because Ho`opono has established all of the
requirements in the <u>Winter</u> analysis, a preliminary injunction is
warranted in this case.  Hoopono's Amended Motion is GRANTED,
and the Marine Corps is ORDERED to maintain Ho`opono as the food
services vendor at MCBH by maintaining the current bridge
contract and/or entering into similar contracts.  The Marine
Corps must maintain Ho`opono as the food services vendor at
MCBH, and the Marine Corps is prohibited from putting the MCBH
contract with TSG into effect, until there is a final decision
in the pending arbitration before the US DOE or until the
injunction is lifted.

## CONCLUSION

On the basis of the foregoing, Hoopono's amended motion for a preliminary injunction, filed March 8, 2019, is HEREBY GRANTED.  The Order Granting Plaintiff's Motion for Temporary Restraining Order, filed May 11, 2018, is HEREBY DISSOVLED, and this Court HEREBY ISSUES a preliminary injunction, according to the terms set forth in this Order.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAI`I, August 21, 2019.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

STATE OF HAWAI`I, DEPARTMENT OF HUMAN SERVICES, DIVISION OF VOCATIONAL REHABILITATION, HOOPONO-SERVICES FOR THE BLIND VS. UNITED STATES MARINE CORPS, ETC.; CV 18-00128 LEK-KJM; ORDER GRANTING PLAINTIFF'S AMENDED MOTION FOR PRELIMINARY INJUNCTION

28